11-1591-cv
Baker v. Goldman Sachs & Co., et al.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: August 23, 2011          Decided: February 15, 2012)

Docket No. 11-1591-cv

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JANET BAKER and JAMES BAKER,

Plaintiffs-Appellants,

v.

GOLDMAN SACHS & CO., GOLDMAN SACHS GROUP, INC.,
and GOLDMAN SACHS & CO., LLC,

Defendants-Appellees,

JESSE EISINGER,

Non-Party Movant-Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

B e f o r e:   WINTER, MINER, and HALL, Circuit Judges.

Appeal from an order entered by the United States District Court for the Southern District of New York (Barbara Jones, Judge), granting a motion to quash a subpoena pursuant to New York's journalists' "Shield Law."  We affirm.

> ALAN K. COTLER (Joan A. Yue, Andrew J. Soven, Reed Smith LLP, Philadelphia, Pennsylvania; Casey D. Laffey, Reed Smith LLP, New York, New York, on the brief), Reed Smith LLP, Philadelphia, Pennsylvania, for Plaintiffs-Appellants.

PAUL VIZCARRONDO, JR. (Tracy O. Appleton, Wachtell, Lipton, Rosen & Katz, New York, New York; John D. Donovan, Jr., Ropes & Gray LLP, Boston, Massachusetts, on the brief), Wachtell, Lipton, Rosen & Katz, New York, New York, for Defendants-Appellees.

GAYLE C. SPROUL (Amanda M. Leith, on the brief), Levine Sullivan Koch & Schulz L.L.P., New York, New York, for Non-Party Movant-Appellee.

WINTER, Circuit Judge:

James and Janet Baker appeal from Judge Jones's quashing of a subpoena directed to Jesse Eisinger, a former Wall Street Journal ("WSJ") reporter. Her decision was based on New York's journalists' Shield Law, New York Civil Rights Law § 79-h. We affirm.

New York's Shield Law provides journalists an absolute privilege from testifying with regard to news obtained under a promise of confidentiality but only a qualified privilege with regard to news that is both unpublished and not obtained under a promise of confidentiality. N.Y. Civ. Rights Law § 79-h(b)-(c) (McKinney 2011). It is the qualified privilege that is at issue on this appeal.

Under this privilege, reporters "who, for gain or livelihood, [are] engaged in . . . writing . . . news intended for a newspaper" are protected from coerced disclosure of "any unpublished news obtained or prepared . . . in the course of gathering or obtaining news . . . , or the source of any such

2

news, where such news was not obtained or received in confidence." N.Y. Civ. Rights Law §§ 79-h(a)(6), (c); Guice-Mills v. Forbes, 819 N.Y.S.2d 432, 434 (N.Y. Sup. Ct. 2006) ("[The] Shield Law[] protects professional journalists from contempt citations when they refuse to disclose information obtained by them during the course of their reporting."). The qualified privilege applies only to unpublished information.

A party seeking unpublished "news" may overcome the qualified privilege by making "a clear and specific showing that the news: (i) is highly material and relevant; (ii) is critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) is not obtainable from any alternative source." N.Y. Civ. Rights Law § 79-h(c). To determine that unpublished news is either "critical or necessary within the meaning of § 79-h, there must be a finding that the claim for which the information is to be used virtually rises or falls with the admission or exclusion of the proffered evidence." In re Application to Quash Subpoena to Nat'l Broad. Co., 79 F.3d 346, 351 (2d Cir. 1996) (internal quotation marks omitted) (also stating that the critical or necessary clause must mean something more than "useful"). "The test is not merely that the material be helpful or probative, but whether or not . . . the action may be presented without it." In re Am. Broad. Cos., 735 N.Y.S.2d 919, 922 (N.Y. Sup. Ct. 2001) (internal quotation marks omitted).

3

The underlying action in this matter was brought by the Bakers against Goldman Sachs & Co., et al., and is currently ongoing in the District of Massachusetts. The Bakers' claims arose out of Goldman's service as the Bakers' financial advisor in a June 2000 sale of their company, Dragon Systems ("Dragon") to Lernout & Hauspie ("L&H") in exchange for L&H stock that soon became worthless. The Bakers' various legal theories assert that Goldman breached a duty to discover an accounting fraud at L&H. In particular, they claim that Goldman failed to exercise proper diligence in investigating and analyzing both L&H's customer relationships and a significant spike in L&H's revenue from Asian customers before its acquisition of Dragon.

The Bakers seek to depose Eisinger regarding two articles published in the WSJ. The first article, which he authored alone, was published on February 16, 2000 -- just before the L&H/Dragon deal was announced in March -- and principally quoted a Lehman Brothers analyst who raised concerns about L&H's earnings and stock valuation.

The second article, published in August 2000, was written by Eisinger and several co-authors and concerned L&H's Asian earnings. It stated that L&H's CEO had "volunteered the names of about a dozen Korean customers" in May "while being questioned about Asian sales by a reporter," and "[s]ubsequently, the company disclosed more names" to the WSJ. App. 58. It also reported that the WSJ contacted and received responses from 13 of

4

the approximately 30 customers supplied by L&H and found that "some companies that L&H [had] identified as Korean customers [said] they [did] no business at all with L&H.  Others [said] their purchases [had] been smaller than L&H says."  Although the article identified many of the companies that responded and described the responses, it did not provide specifics concerning the WSJ  investigation, including details on who at the WSJ contacted the Korean customers and when or how that contact was made.  The Bakers now wish to take a videotaped deposition of Eisinger to be used at trial.

During oral arguments in the district court over Eisenger's motion to quash the subpoena, the court inquired about the Bakers' intended interrogation of Eisinger.  Appellants' counsel stated: "Well, we're going to ask him to confirm what he says was done in the articles which is, among other things, that he received from L&H directly a list of customers which they voluntarily provided to him and that he and his colleagues then proceeded to call those customers and they subsequently published their findings about what those customers told them in the [WSJ]."  Counsel further stated that there "may be a few additional questions related to the articles" that were published before August 8, 2000.  He then argued that "Mr. Eisinger's experience and what . . . he published proves or helps prove" that it was simply not the case that a "forensic accounting firm with international expertise," which Goldman had recommended the

5

Bakers hire, was necessary to discover the L&H fraud, but that Goldman should have discovered the fraud itself. He stated, "The fact that I need to establish is that [Eisinger] did pick up the phone and that he was told by L&H you can contact these 20 or 30 customers and that he and his colleagues proceeded to do it and they proceeded to publish their findings in the newspaper. So I would establish the truth of those statements."

In response, counsel for Goldman argued that if the Bakers were permitted to go into "what Mr. Eisinger did," then Goldman would need to address on cross-examination how the circumstances surrounding the acquisition of Dragon differed from those facing the WSJ at the time the story was written several months later. He noted that those differences included what type of information was available to the public at those times and the fact that Goldman was bound by a confidentiality agreement in place at the time of the acquisition that prohibited them from contacting L&H customers.

The court granted Eisinger's motion to quash, holding that: (i) Eisinger, as a journalist, could claim the Shield Law's protection; (ii) the information sought was covered by the Shield Law; and (iii) the Bakers had failed to overcome the privilege by establishing through "clear and convincing evidence" that the testimony "would be critical and relevant" to the maintenance of their claim. It noted the testimony "invariably require[d] disclosure of the unpublished details of the newsgathering process."

The court found that the scope of questions could not be confined to published information, because even the most basic questions -- such as who made the calls and interviewed the Korean companies -- were unpublished details of the newsgathering process.  Further, to show that a forensic accounting firm was not required to unearth the information obtained by Eisinger, the Bakers "inevitably would have to ask questions regarding Eisinger's techniques for conducting his investigation, the backgrounds of Eisinger's co-authors and the [WSJ's] editorial staff, and whether he consulted with any experts or other sources in the course of the investigation" -- all inquiries into the newsgathering process protected by the Shield Law.  Furthermore, to mount an effective defense, Goldman would need to cross-examine Eisinger broadly about the WSJ investigation.

The district court also held that Eisinger's testimony was not critical or necessary to maintain the Bakers' claims.  It stated that it "is even doubtful Mr. Eisinger's testimony would be relevant to Plaintiffs' claims."  The first WSJ article, although published before the merger, reported only on an earnings conference and a followup research note written by a Lehman Brothers analyst, without any apparent original investigation by the WSJ.  The second article, in which the WSJ investigated L&H's customers, was not published until two months after Dragon's merger with L&H, during which time L&H's financial picture and the ease of contacting customers could have changed.

7

For all these reasons, the court quashed the subpoena. This appeal followed.

An order granting a motion to quash a subpoena is considered final and appealable when such an order denies discovery from a non-party in a suit pending in another jurisdiction. Cf. Corp. of Lloyd's v. Lloyd's U.S., 831 F.2d 33, 34 (2d Cir. 1987) (citing Republic Gear Co. v. Borg-Warner Corp., 381 F.2d 551, 554 (2d Cir. 1967)). This court reviews "[a] district court's ruling on a motion to quash a subpoena . . . for abuse of discretion." Arista Records, LLC v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010).

The above description of the oral argument and the findings of the district court render it virtually self-evident that the Shield Law would protect Eisinger from compelled testimony. Perhaps in recognition of these obstacles, appellants' counsel took a new tack during oral argument in this appeal, announcing that the only question he intended to ask -- apart from the usual pedigree inquiries -- was whether the published information, which is not subject to the qualified privilege, was "accurately reported." In answer to an inquiry from the bench about such a question "open[ing] the door to [defendants] asking all sorts of questions," counsel responded "because someone else wants to cross-examine in a way that may implicate the shield law, that does not prohibit us from asking legitimate questions that do not implicate the shield law." We reject this argument.

8

First, the question counsel proposes to ask cannot be divorced from unpublished material relating to the article. The question seeks an opinion from one of the authors as to the accuracy of a particular news article. This opinion's relevance to the underlying litigation lies entirely within inferences appellants hope will be drawn by the trier of fact with regard to the ability, efficiency, and diligence of the WSJ reportorial personnel; their newsgathering methods generally and as applied in preparing the article; and the witness's personal knowledge and assessment of these matters. The question's purpose is to provide a basis for inferences as to these matters.

Indeed, the opinion sought would not be admissible under Federal Rule of Evidence 701 without foundation evidence showing that the opinion was "rationally based" on Eisinger's perception and "helpful to . . . determining a fact in issue," which would require testimony squarely within the shielded area. Even if some component of the opinion was deemed to involve "technical" or "specialized" knowledge regarding journalism -- i.e., an expert opinion -- Federal Rule of Evidence 702's requirement of a showing that such knowledge was "reliably applied . . . to the facts of the case" would enter the protected area.

Second, even if the limited question proposed were assumed for purposes of argument to avoid the privileged area, we disagree with appellants' argument that the nature of the cross-examination that would inevitably follow is not before us at this

9

time.  Once any direct examination is concluded, cross-examination within the scope of the direct follows.  Fed. R. Evid. 611.  It is beyond cavil that such cross-examination would have to dwell on the inferences that the question is intended to support and thus would enter the area of the privilege.

Subpoenas seek attendance and testimony at a deposition or trial to be questioned about matters relevant to the underlying litigation.  The compulsion applies to both testimony on direct and cross-examination on that subject matter.  See App. at 50 (subpoena of Jesse Eisinger); Fed. R. Evid. 611.  The would-be cross-examiner is not required to seek a second subpoena to ask questions within the scope of the direct.  See App. at 50; Fed. R. Evid. 611.  This is so even when the witness asserts a privilege.  Cf. In re von Bulow, 828 F.2d 94, 102 (2d Cir. 1987).

Indeed, in a criminal case, we have recently held with regard to a journalist's privilege that once the prosecution has overcome the claim of privilege and conducted its desired direct examination, the Confrontation Clause requires that the usual cross-examination as to credibility and matters within the scope of the direct examination be allowed.  United States v. Treacy, 639 F.3d 32, 44–45 (2d Cir. 2011).  We see no great impediment to extending that approach to civil cases.  The law of evidence embodies a rule of completeness requiring generally that adversaries be allowed to prevent omissions that render matters in evidence misleading.  With regard to writings, one cannot

10

introduce only the favorable portion of a document without the adversary successfully demanding production of the entire writing. Kenneth S. Broun et al., McCormick on Evidence § 93 (6th ed. 2007); Fed. R. Evid. 106. The same applies to testimony as to only part of a privileged communication: the remainder must also be produced. In re von Bulow, 828 F.2d at 102; McCormick on Evidence § 93. With regard to testimony generally, the adversary has the right to cross-examine within the scope of the direct examination, Fed. R. Evid. 611, and as to issues relating to credibility. See, e.g., Fed. R. Evid. 607, 608(b). To be sure, some close questions may arise in future proceedings in which the need for cross-examination into materials privileged under the Shield Law would be doubtful. That is not a problem in this matter, however, because the need for cross-examination within the area of the privilege is absolutely clear.

Third, under the New York statute, the application of the privilege turns on the subject matter of the inquiry and does not distinguish between direct and cross-examination. The burden of overcoming the privilege, once asserted, is on the party seeking direct testimony, but that procedure does not divorce direct and cross-examination. Rather it is simply a burden of going forward that is pragmatically necessary -- the adversary usually has no interest in overcoming the privilege -- and universally employed with regard to assertions of privilege. See, e.g., New York Times Co. v. Gonzales, 459 F.3d

11

160, 169–71 (2d Cir. 2006); <u>Am. Sav. Bank, FSB v. UBS Painewebber, Inc.</u>, No. M8-85, 2002 WL 31833223, at *3 (S.D.N.Y. Dec. 16, 2002), <u>aff'd sub nom.</u> <u>In re Fitch</u>, 330 F.3d 104 (2d Cir. 2003) (per curiam).

Appellants' position, if adopted, would undermine the privilege created by New York's statutory shield law.  If the proposed question was allowed to be asked and answered on the ground that it sought information outside the protected area, the cross-examiner could then easily overcome the privilege by showing a critical need to establish Goldman's defense to the inferences to be drawn from the answer.  The result would turn the statute on its head by allowing an evasion of the privilege through a question deliberately framed to be (supposedly) outside the scope of the privilege to have the effect of compelling testimony on cross-examination within the privilege.  We decline to follow a route leading to this result.

We therefore affirm.