17-3741-cr
*United States v. Williams*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2018

(Argued: November 29, 2018          Decided: July 9, 2019)

No. 17-3741-cr

_____

UNITED STATES OF AMERICA,

*Appellee,*

-v.-

ANDY WILLIAMS,

*Defendant-Appellant.*

_____

Before:      KEARSE, LIVINGSTON, and CARNEY, *Circuit Judges.*

Defendant-Appellant Andy Williams appeals from a judgment entered in the United States District Court for the Eastern District of New York (DeArcy Hall, *J.*) convicting him of being a felon in possession of a firearm. On appeal, Williams argues that (1) the gun found in his car should have been suppressed at trial, because it was discovered during a second warrantless search of the car that was conducted only after detectives overheard Williams make a phone call that aroused their suspicions that they may have missed something of value in the car during their initial inventory search; (2) his post-arrest statements denying ownership of the gun should have been admitted at the same time as his oral and

written confessions; and (3) evidence as to his gang affiliation and willingness to assist police in finding guns and drugs should have been excluded under Fed. R. Evid. 403 and 404(b). We conclude that (1) both searches of Williams's car were valid inventory searches; (2) contrary to Williams's argument, the district court did not abuse its discretion in declining to admit his post-arrest statements denying ownership of the gun; and (3) Williams's arguments as to the inadmissibility of the evidence of his gang affiliation and willingness to assist the police either (a) fail because the evidence was properly admitted pursuant to Rule 404(b) and was not unfairly prejudicial or (b) are waived.

Accordingly, the judgment of the district court is AFFIRMED.

FOR APPELLEE: TANYA HAJJAR, Assistant United States Attorney (Jo Ann M. Navickas, Assistant United States Attorney, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, New York.

FOR DEFENDANT-APPELLANT: DARRELL FIELDS, Federal Defenders of New York, Inc., Appeals Bureau, New York, New York.

DEBRA ANN LIVINGSTON, *Circuit Judge*:

Defendant-Appellant Andy Williams ("Williams") appeals from a judgment of the United States District Court for the Eastern District of New York (DeArcy Hall, *J.*), entered November 14, 2017, following a jury trial, convicting him of being a felon in possession of a firearm. On appeal, Williams argues that (1) the loaded firearm found in the center console of the rental car that he was driving on the day of his arrest should have been suppressed at trial because it was discovered during

an improper second inventory search of the vehicle; (2) his exculpatory post-arrest statements denying knowledge or ownership of the firearm should have been admitted when his oral and written statements confessing ownership were introduced; and (3) evidence as to his gang affiliation and willingness to assist police in finding guns and drugs should have been excluded under Fed. R. Evid. 403 and 404(b).

We conclude that (1) police did not violate the Fourth Amendment by returning to search Williams's car again after detectives overheard Williams make a phone call that aroused their suspicion that they may have missed something of value in the car during their initial inventory search; (2) contrary to Williams's claim, neither the doctrine of completeness nor the Fifth Amendment mandated the admission of his post-arrest statements denying ownership or knowledge of the gun; and (3) Williams's arguments as to the inadmissibility of the evidence of his gang affiliation and willingness to assist the police either (a) fail because the evidence was properly admitted pursuant to Rule 404(b) and was not unfairly prejudicial or (b) are waived. Accordingly, we affirm the judgment of the district court.

## BACKGROUND

### I. Factual Background[1]

On the clear morning of August 27, 2015, three plainclothes detectives from the New York City Police Department's ("NYPD") Brooklyn South Gang Squad sat in an unmarked car on Utica Avenue in Brooklyn. Inside a nearby funeral home, mourners were gathered for funeral services. The deceased had been in a gang, so Detective Dominick Latorre ("Detective Latorre") and his colleagues were keeping an eye on the surrounding area in case rival gangs showed up looking to cause trouble. At around 10 A.M., the detectives spotted a white Nissan sedan traveling at a high rate of speed. The driver was recklessly weaving between traffic lanes so as to cut others off, and was heading in the direction of the funeral home. The detectives gave chase, caught up to the Nissan, and signaled to the driver, Williams, to pull over. Williams pulled to the side of the road.

Detective Latorre approached the driver's side of the car and asked Williams, who was alone in the sedan, for his license and registration. Williams provided his license and a rental agreement for the Nissan. Detective Latorre

---

[1] The factual background presented here is derived principally from the trial transcript and otherwise reflects information in the district court record.

immediately observed that the car had been rented to someone else, Jennisha Hosam ("Hosam"), and that Williams was not listed in the agreement as an authorized driver. Williams claimed the Nissan was his "girl's car." GA-55.[2] The detectives then arrested Williams for unauthorized use of the rental car as well as for speeding and driving recklessly. He was placed in the back of the detectives' car and transported to the nearest precinct by Detective Latorre and one of his colleagues, Detective Joseph Fichter ("Detective Fichter"). The third detective, Detective Michael Christiano, followed in Williams's car and parked it out front.

At the precinct, Williams was put in a holding cell while the detectives began to process the arrest. Detective Fichter commenced an "inventory search" of Williams's car while Detective Latorre observed. According to Detective Latorre, an inventory search is mandatory in arrest processing: "[I]ts importance is to make sure that things are returned to the proper owner and that the wrong things or dangerous things are not returned to anyone." GA-38–39. The car's interior, glove box, and trunk were all searched, yielding several items, including: (1) a roll of duct tape, in the glove box; (2) a pair of black gloves, from the driver's

---

[2] "A" refers to the Appendix for Defendant-Appellant Andy Williams; "SPA" refers to the Special Appendix for Defendant-Appellant Andy Williams; "GA" refers to the Government Appendix.

5

side door; and (3) a black mask made of hard plastic, which Detective Fichter discovered in the trunk of the car, wedged inside the enclosed area containing the spare tire. Detective Fichter also recovered postmarked envelopes from the Nissan dated August 21, 2015, and addressed to Williams. After finding these items, Detectives Latorre and Fichter went back inside the precinct to continue processing Williams's arrest.

As Detective Latorre was fingerprinting Williams, Williams asked what was going to happen to the rental car. Detective Latorre informed him that the car was probably going to be towed back to the rental agency. Seemingly alarmed by this prospect, Williams said "I'm entitled to a phone call. I want to make one." SPA-6. Detective Latorre handed Williams a phone. Williams proceeded to call someone (he said it was his girlfriend) and, standing about two or three feet away from Detective Latorre, told this person that he or she needed to "come get this car right now" because the police were "looking to tow it." GA-41–42; SPA-6–7. Williams spoke at a high pitch and fast pace that Detective Latorre took to indicate that Williams's "stress level was elevated . . . he sounded definitely more stressed." GA-42.

Detective Latorre thought Williams's agitation was curious. He and Detective Fichter decided to go back and search the car again to make sure that "there was [not] something more important in the vehicle that we didn't see yet." GA-42–43; SPA-7. As Detective Fichter put it, "I felt I missed something." GA-97. On the way to the car, in what turned out to be a fortunate encounter, they ran into Detective Ashley Breton ("Detective Breton"), who volunteered to help as "an extra pair of eyes." GA-42; SPA-8. After just one to two minutes of searching the interior of the car, including the front area, arm rests, and front and rear seats, Detective Breton popped open the car's center console, which Detective Fichter had not previously examined. There, Detective Breton discovered a loaded gun. According to Detective Breton, though the console in the Nissan is not designed to open, it can be opened easily with no need for special tools or force by unsnapping three plastic pieces "that connect to the left side paneling" and that can be easily snapped back into place to close the console. A-110; GA-11. Indeed, Detective Breton testified that he usually checks inside car consoles during inventory searches, because he has located contraband there "more than once." A-111.

After the firearm was discovered, Williams was rearrested and taken to a private room to be interviewed. There, Detectives Latorre and Fichter read him his *Miranda* rights, using a standard form. Williams agreed to waive his rights and signed the form, affirming his willingness to answer questions. Williams thereafter orally acknowledged that the firearm belonged to him and, at the detectives' request, he wrote out a statement memorializing this confession. The signed statement reads in full: "I had the gun. I had no intenten of hurting any1 Im sorry." A-162; GA-48–49. During the same interview, Williams told the detectives that he is a member of the Crips gang, that he is also known as "Spillz," and that he associates with people in both the Crips and Folk Nation gangs. Williams further indicated that he was "willing to work," and could "get firearms and narcotics."[3] GA-104–05, 118.

Hosam, who rented the white Nissan sedan, testified at Williams's trial. A student at Borough of Manhattan Community College, Hosam gave Williams a lift one day when she saw him in the Brooklyn neighborhood where her son goes to day care. (She had known Williams for about a year at that time, she ran into him

---

[3] At trial, in addition to testimony regarding Williams's post-arrest statements acknowledging his gang membership, the government introduced images from Williams's public Facebook page. These images depict Williams and others making hand signs identified by Detective Fichter as associated with the Crips or Folk Nation gangs.

periodically, and she was not his girlfriend.) Hosam was then driving a red Nissan Ultima that she had rented for the weekend. Upon learning that Hosam was driving a rental car, Williams asked if she would be willing to rent a car for him, as he did not have a credit card. Hosam first extended the rental of the red Nissan, giving Williams its use. Williams paid Hosam for the rental in cash, which "worked in [her] favor too pretty much," as she "could use the car as well without paying for it." GA-74, 80. When the red Nissan Ultima was shortly thereafter involved in a minor accident, Hosam exchanged it for a light-colored vehicle, which she also provided to Williams. The only occasion on which she drove this second car, which she did not recall well, was "[t]he day that we exchanged it," and after providing the car to Williams, she saw him only twice between July and late August 2015. GA-76, 141. She left no personal items in the second car, and specifically left neither gloves nor a mask in the vehicle. She also did not leave a firearm in the car and had never owned one.

## II.   Procedural History

Williams was indicted by a grand jury in the Eastern District of New York in October 2015, less than two months after his arrest, and was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Williams

9

pled not guilty. He moved to suppress the firearm, arguing that police had violated the Fourth Amendment when, after conducting the first inventory search, they returned to the car following his phone call and located the concealed and loaded weapon. The magistrate judge held an evidentiary hearing at which Detectives Latorre and Breton testified. The magistrate judge then issued a Report and Recommendation recommending that Williams's suppression motion be denied. The district court adopted the Report and Recommendation and denied the motion.

The first of what would ultimately be three jury trials commenced on October 24, 2016, and ended in a mistrial two days later because the jury could not reach a unanimous verdict. The second trial commenced on December 12, and again ended in a mistrial. The third trial commenced on May 23, 2017, and a week later the jury convicted Williams of being a felon in possession of a firearm. After Williams's conviction, Judge DeArcy Hall sentenced him to 56 months' imprisonment to be followed by three years' supervised release. Williams timely appealed.

## DISCUSSION

Williams makes three arguments on appeal. First, he argues that the second search of his car was not a valid inventory search pursuant to the Fourth Amendment and that the loaded gun, accordingly, should have been suppressed. Second, he argues that the district court erred by precluding him from introducing his post-arrest statements in which, before admitting to ownership of the weapon, he denied any knowledge of it. Finally, Williams argues that the district court erred by allowing the government to introduce his post-arrest statements regarding his gang affiliation, as well as the images from his Facebook page, because this evidence was inadmissible propensity evidence and unfairly prejudicial. We address each argument in turn.

### I.  The Car Searches

Williams first argues that the district court erred in denying his motion to suppress the gun seized during the second search of his car on the theory that this second search violated the Fourth Amendment. In Williams's view, only the detectives' *initial* search of the car was a valid inventory search. He contends that the second search—conducted after Detective Latorre overheard Williams make a phone call during which Williams nervously insisted to the other person on the

11

line that he or she needed to "come get this car right now"—was a "purposeful investigatory search" and not an inventory search permissible among "the category of 'caretaking activities' that police departments [must] perform." Appellant Br. 34. When reviewing a district court's decision on a suppression motion, we review the district court's factual findings for clear error and its legal conclusions *de novo*. *United States v. Stewart*, 551 F.3d 187, 190 (2d Cir. 2009). For the following reasons, we conclude that Williams's Fourth Amendment claim is unavailing.

\*     \*     \*

The Supreme Court has long recognized that when police "take a vehicle into custody, they may search the vehicle and make an inventory of its contents without need for a search warrant and without regard to whether there is probable cause to suspect that the vehicle contains contraband or evidence of criminal conduct." *United States v. Lopez*, 547 F.3d 364, 369 (2d Cir. 2008) (citing *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983)). These "inventory searches" are excepted from the probable cause and warrant requirements "because they are conducted by the government as part of a community caretaking function" that police must perform separate and apart from their responsibility to detect crime. *Colorado v. Bertine*, 479

12

U.S. 367, 381 (1987) (internal quotation marks omitted); *Lopez*, 547 F.3d at 369. We have described the objectives of inventory searches as "(1) to protect the owner's property while it is in police custody; (2) to protect the police against spurious claims of lost or stolen property; and (3) to protect the police from potential danger." *Lopez*, 547 F.3d at 369. "The service of these objectives is wholly independent of whether the contents of the car figure in any way in a criminal investigation or prosecution." *Id.* at 369–70.

Because of the "danger to privacy interests" posed by allowing police officers to conduct warrantless searches, *see id.* at 370, the Supreme Court has required that inventory searches be performed using "standardized criteria or established routine," *Florida v. Wells*, 495 U.S. 1, 4 (1990); *see South Dakota v. Opperman*, 428 U.S. 364, 372 (1976) ("[I]nventories pursuant to standard police procedures are reasonable."); *see also* 3 LaFave, Search and Seizure: A Treatise on the Fourth Amendment 644 (4th ed. 2004) ("What is needed in the inventory context, then, as is true of many other types of inspections or regulatory searches, is not probable cause but rather a regularized set of procedures, which adequately guards against arbitrariness."). A police department's standardized procedures may be established at trial by written rules and regulations or by testimony

regarding the department's standard practices. *See United States v. Thompson*, 29 F.3d 62, 65–66 (2d Cir. 1994).

We first conclude, as the district court did, that both searches of Williams's car were conducted in accordance with the NYPD's standardized procedures for inventory searches as described in the Department's Patrol Guide and in Detective Breton's testimony at the suppression hearing. The Patrol Guide provides that "[w]henever [an automobile] comes into the custody of [the NYPD]," officers should "[s]earch the interior of the vehicle thoroughly," including "*any area* that may contain valuables." A-39 (emphasis added). The Patrol Guide also authorizes officers to "[f]orce open [the] trunk, glove compartment, etc.," so long as it can "be done with minimal damage." A-39. Detective Breton testified at the suppression hearing, based on his "hundreds" of inventory searches, that searching behind the paneling of a car's center console is a "common" practice. GA-8; A-110–11.

There is no dispute that the first search followed NYPD procedures. As to the second, although his briefing to this Court did not challenge the *manner* in which this search was performed, at oral argument Williams made much of the fact that during the second search, Detective Breton had to "force open" the console of Williams's car by removing the console's paneling in order to reveal the

14

gun. *See* Recording of Oral Argument, *United States v. Williams*, No. 17-3741 (2d Cir. Nov. 29, 2018), at 5:00–7:20, 22:20–23:00. However, the Patrol Guide specifically says that officers can force open the "trunk, glove compartment, *etc.*," if only minimal damage will be done, and Detective Breton testified that it was common for police to search center consoles during inventory searches. A-39 (emphasis added); *see* A-110–11. Detective Breton also testified that he did not have to use any sort of "special tool" to remove the paneling; nor did it take much force; nor was any damage done to the car, as the paneling could be "snap[ped] right back into place." GA-11–12; A-110. The district court did not err in determining that removing the paneling to check inside the car's center console was consistent with the NYPD's standard procedures.

Williams principally argues as to the second inventory search that it was impermissible for the detectives to conduct the second search at all, pointing out, at the start, that the Patrol Guide is silent as to the validity of *multiple* inventory searches. However, we have stated that "we do not think . . . *every detail* of search procedure must be governed by a standardized policy." *Lopez*, 547 F.3d at 371 (emphasis added). For example, there need not be a standardized policy as to "the order in which different parts of [a] car are searched, or whether officers

15

performing the search need to report the results on a standardized form." *Id.* A police department's procedures must simply be adequate to "safeguard the interests protected by the Fourth Amendment," *see id.*, so that officers are not allowed "so much latitude" as to whether, when, and how to search that inventory searches, in practice, become a "'a purposeful and general means of discovering evidence of crime.'" *Wells*, 495 U.S. at 4 (quoting *Bertine*, 479 U.S. at 376). Here, the second inventory search did not run afoul of this principle, even if not specifically provided for in the Patrol Guide.

As for Williams's broader Fourth Amendment argument, the Supreme Court has repeatedly said that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006); *see Riley v. California*, 573 U.S. 373, 381 (2014) (same); *see also Maryland v. King*, 569 U.S. 435, 447 (2013) (noting that the "'ultimate measure of the constitutionality of a governmental search is "reasonableness"'") (quoting *Vernonia School Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995)). In the circumstances here, it was eminently reasonable for the detectives to conclude, as they did, that Williams's own behavior suggested a need to go back and check their work in connection with the inventory search that they had just performed. Williams's phone call caused the

detectives to surmise, as Detective Latorre stated during the suppression hearing, that "there was something of value inside the car that [they weren't] yet aware of," so that "a second search of the vehicle was probably necessary" in order to complete the inventory. A-59. The fact that some piece of property may have been missed during the initial search did not make it *less* important to secure that property, to protect the police from claims of theft, or to ensure that the property be safeguarded if dangerous. Indeed, the need to ascertain that the inventory was complete and that all items in the car had been located was particularly acute in this case, given that police were likely to return the car to the rental agency, and "elemental reasons of safety" required that any dangerous instrument in the vehicle, such as the loaded weapon that they recovered, be located so as not to "fall into untrained or perhaps malicious hands." *See Cady v. Dombrowski*, 413 U.S. 433, 443 (1973) (noting police have a community caretaking imperative to ensure that impounded automobiles do not contain revolvers or other dangerous items).

Williams contends that the search of the Nissan by Detective Breton was not a valid inventory search, even if consistent with standard police practices, because the officers' purpose in looking over the car for a second time was supposedly not to conduct an inventory, but "to validate [their] suspicion and uncover evidence

17

of a crime." Appellant Br. 34–35. We do not believe that the suppression hearing record supports this conclusion. But even if the record did clearly reflect that the officers were motivated, at least in part, by the expectation that evidence would be discovered in the car, Williams's Fourth Amendment argument would still be without merit.

In general, "[a]n action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.'" *Brigham City*, 547 U.S. at 404 (quoting *Scott v. United States*, 436 U.S. 128, 138 (2006)); *accord Laidley v. City and Cty. of Denver*, 477 F. App'x 522, 524 (10th Cir. 2012) (Gorsuch, *J.*) ("[Plaintiff's] failure to argue that the towing of his car was not *objectively* justified under the community caretaking doctrine (whatever any officer's actual motivations happened to be) unavoidably spells the end to his Fourth Amendment claim."). As we recognized in *United States v. Lopez*, "[w]hen officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under

18

standardized procedures for legitimate custodial purposes." 547 F.3d at 372.

We recognize that the Supreme Court, in *Colorado v. Bertine*, affirmed that inventory searches are reasonable for Fourth Amendment purposes when "administered in good faith," "according to standard criteria and on the basis of something *other than suspicion of evidence of criminal activity*." 479 U.S. 367, 374–75 (1987) (emphasis added). Moreover, the Court in dicta has suggested that the inventory search doctrine may be a rare example in which an officer's improper motive *can* invalidate "objectively justifiable behavior under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 464 (2011) (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)). But the Supreme Court has also cautioned that the relevant "purpose" at issue in assessing programmatic searches and seizures conducted without individualized suspicion, such as the inventory search at issue here, is *not* the officer's subjective purpose in searching, but the purpose of the *administrative program itself. Brigham City*, 547 U.S. at 405; *see also City of Indianapolis v. Edmond*, 531 U.S. 32, 48 (2000) ("[W]e caution that the purpose inquiry in this context is to be conducted only at the programmatic level . . . ."). Chief Justice Roberts, writing for a unanimous Court in *Brigham City* and citing *Wells*, the Court's most recent inventory search case, observed that the Fourth Amendment

inquiry in the context of programmatic searches and seizures has "*nothing* to do with discerning what is in the mind of the individual officer conducting the search," but is instead directed at "ensuring that the purpose behind the *program* is not 'ultimately indistinguishable from the general interest in crime control.'" *Brigham City*, 547 U.S. at 405 (quoting *Edmond*, 531 U.S. at 44); *see also Wells*, 495 U.S. at 4 (noting that "[t]he policy or practice governing inventory searches should be designed to produce an inventory").

We need not parse these lines of Supreme Court authority further and assess whether an officer's motive might prove relevant to the validity of an inventory search in circumstances not presented here. Suffice it to say that as for the Fourth Amendment inquiry in *this* case, the present matter is on all fours with this Court's decision in *Lopez*, where we concluded that "if a search of an impounded car for inventory purposes is conducted under standardized procedures," as this one was, "that search falls under the inventory exception to the warrant requirement of the Fourth Amendment, notwithstanding a police expectation that the search will reveal criminal evidence." *Lopez*, 547 F.3d at 372; *accord United States v. McKinnon*, 681 F.3d 203, 209–10 (5th Cir. 2012).[4] "If good faith is a prerequisite of

_____

[4] District courts in our Circuit have correctly interpreted *Lopez* to mean that an officer's subjective motivations in performing an inventory search generally will not

20

an inventory search," we said there, "the expectation and motivation to find criminal evidence" do not, without more, "constitute bad faith." *Id.*

Here, as to programmatic purpose, nothing in the record suggests that the NYPD inventory-search program at issue was but "a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4. The Patrol Guide states that the program's purpose is to "protect property, ensure against unwarranted claims of theft, and protect uniformed members of the service and others against dangerous instrumentalities." A-39. The NYPD detectives here testified that inventory searches are conducted to serve this purpose. *See* GA-6 (Detective Breton testifying that inventory searches allow police to "take in any property that would need to get vouchered"); GA-40 (Detective Latorre testifying that the importance of inventory searches is "to make sure that things are returned to the proper owner and that the wrong things or dangerous things are not returned to anyone"); GA-92 (Detective Fichter testifying that inventory searches

---

invalidate an otherwise-reasonable search. *See, e.g.*, *United States v. Wallace*, 2016 WL 4367961, at *10 (S.D.N.Y. Aug. 11, 2016) ("The subjective investigatory motivation of an officer does not normally defeat the legality of an otherwise proper inventory search."); *Bryant v. Village of Greenwood Lake*, 2013 WL 5952610, at *4 (S.D.N.Y. Nov. 6, 2013), *aff'd sub nom*, *Bryant v. Dasilva*, 582 F. App'x 56 (2d Cir. 2014) ("An otherwise-reasonable inventory search will not be rendered unreasonable merely because an officer is motivated in part by investigatory purposes or by the expectation that the search will yield evidence.").

21

are conducted "to make sure that all property is removed from inside the car").

As to the detectives' subjective motivations for search, we agree with the *Lopez* panel that "the Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a lawful inventory search." 547 F.3d at 372. Williams's conduct in the wake of the first inventory search alerted the detectives that their initial search may have been faulty, and that items requiring inventory might still remain in the car. In these circumstances, even assuming *arguendo* that the detectives also expected that they might find evidence of a crime during their second search, this fact alone did not obviate the need for that second inventory search. Nor did it render the second search unreasonable under the Fourth Amendment. The second search, like the first, was a reasonable inventory procedure, and Williams's suppression motion was properly denied.

## II.   The Evidentiary Rulings

Williams next argues that his conviction must be reversed because the district court erred: (1) in declining to require the government to introduce his exculpatory post-arrest statements at the time it introduced his inculpatory statements; and (2) in admitting post-arrest statements and other evidence of his affiliation with the Crips. We review the district court's evidentiary rulings "under

22

a deferential abuse of discretion standard, and we will disturb an evidentiary ruling only where the decision to admit or exclude evidence was 'manifestly erroneous.'" *United States v. McGinn*, 787 F.3d 116, 127 (2d Cir. 2015) (quoting *United States v. Samet*, 466 F.3d 251, 254 (2d Cir. 2006)). This standard has not been met in the circumstances here.

## A. The Exculpatory Post-Arrest Statements

When Williams was interviewed after his concealed weapon was discovered in the center console of the Nissan, he denied ownership of the car, telling the detectives, in substance, that "the car wasn't his," but "was his girlfriend's" or "belonged to the girl." A-255, 259. When the detectives informed him that they had found a gun in the car, he at first denied knowing anything about the weapon, and claimed that he was merely trying to return the car. The detectives then asked who the gun belonged to, and if Williams was "trying to tell us something like it belongs to your girlfriend?" A-255. Williams at that point admitted that the gun belonged to him and he wrote and signed a statement saying "I had the gun." *See* GA-47–48. Before trial, the government moved to bar Williams from introducing that portion of his post-arrest statement in which he asserted, in effect, that he didn't know anything about the weapon and was merely trying to

23

return the car. The district court granted the motion. On appeal, Williams argues that this was reversible error because the district court's ruling violated both the doctrine of completeness and the Fifth Amendment. For the following reasons, we conclude that the district court did not abuse its discretion and that Williams's argument to the contrary is without merit.

\*     \*     \*

At common law, the doctrine of completeness arose to permit a party against whom a part of a writing or utterance has been introduced to "in his turn complement it by putting in the remainder, in order to secure for the tribunal a complete understanding of the total tenor and effect" of the whole. 7 Wigmore on Evidence § 2113, at 653 (Chadbourn rev. ed. 1978). Fed. R. Evid. 106, which partially codifies this common law completeness doctrine, provides as follows:

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time.

Fed. R. Evid. 106. The purpose of the rule is to correct, contemporaneously, the "misleading impression created by taking matters out of context," Fed. R. Evid. 106 advisory committee note (1972 Proposed Rules), and the rule "requir[es] generally that adversaries be allowed to prevent omissions that render matters in

evidence misleading," *Baker v. Goldman Sachs & Co.*, 669 F.3d 105, 111 (2d Cir. 2012); *see United States v. Castro*, 813 F.2d 571, 575–76 (2d Cir. 1987) (noting that adverse party can demand that an omitted portion "be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial understanding of the admitted portion"); *accord United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982). The completeness doctrine, however, has never "'require[d] the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages.'" *United States v. Gupta*, 747 F.3d 111, 139 (2d Cir. 2014) (quoting *United States v. Johnson*, 507 F.3d 793, 796 (2d Cir. 2007) (internal quotation marks omitted)); *see* 7 Wigmore on Evidence § 2113, at 656 (noting that because "sole purpose" in eliciting remainder "is to obtain a correct understanding of the effect of the part first put in," irrelevant material not explanatory of the rest is not required to be admitted). And ultimately, it is for the district court, in its discretion, to determine if the rule applies. *See id.*

Rule 106 does not cover oral statements—as the advisory committee note states, "[f]or practical reasons, [Rule 106] is limited to writings and recorded statements and does not apply to conversations." Fed. R. Evid. 106 advisory

committee note (1972 Proposed Rules). However, the *common law* rule of completeness is substantially broader than Rule 106, covering "not only writings taken out of context, but also . . . the truncated use of acts, *declarations, and conversations*." 21A Kenneth W. Graham, Jr., Federal Practice and Procedure § 5072 (2d ed. 2015) (emphasis added). And as the Supreme Court made clear in *Beech Aircraft Corp. v. Rainey*, the common law doctrine persists in the wake of Rule 106's adoption. *See* 488 U.S. 153, 171–72 (1988); 21A Graham, *supra*, § 5073 n.1 (stating that *Beech Aircraft* "held that adoption of Rule 106 did not repeal the common law completeness doctrine; hence, that doctrine can be invoked for completeness where Rule 106 does not apply").

This Court has expressly recognized as to oral statements that Fed. R. Evid. 611(a) both "empowers and obligates" district courts to require "a party offering testimony as to an utterance to present fairly the 'substance or effect' and context of that statement," just as the common law doctrine requires. *See Castro*, 813 F.2d at 576.[5] As a result, in this Circuit, the completeness principle applies to oral statements through Rule 611(a), so that "whether we operate under Rule 106's

---

[5] Rule 611(a) allows district courts to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to . . . make those procedures effective for *determining the truth*." Fed. R. Evid. 611(a) (emphasis added).

embodiment of the rule of completeness, or under the more general provision of Rule 611(a), we remain guided by the overarching principle that it is the trial court's responsibility to exercise common sense and a sense of fairness" so as to require completion, whether contemporaneous or on cross-examination, in instances in which testimony regarding oral statements is elicited in fragments that misrepresent "'the tenor of the utterance as a whole.'" *Id.* (quoting 7 Wigmore on Evidence § 2099, at 618); *see also id.* (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 106[01], at 106–4 (1986 ed.) for the proposition that "compared to Rule 106, Rule 611(a) 'provides *equivalent control* over testimonial proof'" (emphasis added)).[6]

---

[6] The great majority of our sister circuits to have addressed the issue have agreed. *See United States v. Verdugo*, 617 F.3d 565, 579 (1st Cir. 2010) (noting that "the district court retained substantial discretion under Fed. R. Evid. 611(a) to apply the rule of completeness to oral statements"); *United States v. Lopez-Medina*, 596 F.3d 716, 734 (10th Cir. 2010) ("We have held the rule of completeness embodied in Rule 106 is substantially applicable to oral testimony[] as well by virtue of Fed. R. Evid. 611(a) . . . ." (internal quotation marks omitted)); *United States v. Holden*, 557 F.3d 698, 705 (6th Cir. 2009) ("The common law version of the rule was codified for written statements in Fed. R. Evid. 106, and has since been extended to oral statements through interpretation of Fed. R. Evid. 611(a)."); *United States v. Range*, 94 F.3d 614, 620–21 (11th Cir. 1996) ("Fed. R. Evid. 611(a) has been read to impose the same [Rule 106] fairness standard upon conversations." (citation omitted)); *United States v. Haddad*, 10 F.3d 1252, 1258 (7th Cir. 1993) ("[T]he Seventh Circuit has applied a Rule 106 analysis with respect to oral statements and testimonial proof.").

Williams argues that the district court erred in preventing him from eliciting testimony at trial from Detectives Latorre and Fichter that he first *denied* knowledge or ownership of the firearm found in the center console of the Nissan before admitting, as both Detectives Latorre and Fichter testified, that the gun was his. In both its brief and in oral argument, the government has suggested, to the contrary, that Williams's statements were hearsay when proffered by him, and so inadmissible "unless they fell under some exception to the hearsay rules." Gov. Br. 30. The government also argues that the district court did not abuse its discretion in concluding that Williams's initial claim to know nothing about the gun neither explains his later admissions nor dispels a misleading impression as to them, so that completion was not required. We reject the government's first argument, but are persuaded by its second.

With respect to the government's suggestion that evidence proffered under the rule of completeness may be excluded whenever not independently admissible due to the hearsay rule, this is simply not correct. True, a party cannot circumvent the hearsay rule simply by invoking the doctrine of completeness so as to render otherwise inadmissible evidence admissible for its truth. As Wigmore recognized, completing evidence "merely aids in the construction of the utterance as a whole,

28

and is not itself testimony." 7 Wigmore on Evidence § 2113, at 659. But when the omitted portion of a statement is *properly* introduced to correct a misleading impression by putting into context that portion already admitted, it is *for this very reason* admissible for a valid, *nonhearsay* purpose: to explain and place in context the evidence that has already been introduced. As we have said before, "even though a statement may be hearsay," it nevertheless "must be placed in evidence if necessary to explain the admitted portion [of this statement], to place the admitted portion in context, to avoid misleading the jury, or to ensure the fair and impartial understanding of the admitted portion." *Johnson*, 507 F.3d at 796; *see also United States v. Coplan*, 703 F.3d 46, 85 (2d Cir. 2012) (noting that evidence proffered pursuant to Rule 106 is not properly excluded because it is hearsay but must be assessed under "the Rule 106 standard"). Indeed, the doctrine "can adequately fulfill its function only by permitting the admission of some otherwise inadmissible evidence when the court finds in fairness that the proffered evidence should be considered contemporaneously." *United States v. Sutton*, 801 F.2d 1346, 1368 (D.C. Cir. 1986).

The government's first argument is thus unavailing. We are persuaded, however, by its second: that although it was within the district court's discretion

to permit Williams to elicit his initial false exculpatory statements, Williams has failed to show that the district court *abused* its discretion in deciding to exclude them. To require completion under the doctrine of completeness, Williams had to demonstrate that admission of his initial statements denying ownership of the gun was "necessary to explain" his later statements that the gun was his, "to place [these statements] in context, to avoid misleading the jury, or to ensure fair and impartial understanding" of these later statements. *Castro*, 813 F.2d at 576. Williams did not make such a showing. It is not uncommon for a suspect, upon interrogation by police, to first claim in a self-serving manner that he did not commit a crime, only thereafter to confess that he did. But the rule of completeness does not *require* the admission of self-serving exculpatory statements in all circumstances, *see United States v. Jackson*, 180 F.3d 55, 73 (2d Cir. 1999), and the mere fact that a suspect denies guilt before admitting it, does not—without more—mandate the admission of his self-serving denial. As the district court here aptly pointed out, Williams's confession was "simply a reversal of his original position." A-244–45.

Williams argues that the juries at his first two trials heard the exculpatory portions of his post-arrest statements and that the deadlock of these juries

demonstrates the importance of this evidence and the error in excluding it at his third trial. We disagree. The standard of review here is abuse of discretion. *See Jackson*, 180 F.3d at 73 (noting that district court's application of rule of completeness doctrine "is reviewed only for abuse of discretion"); *accord Castro*, 813 F.2d at 576 (observing that reviewing courts "must limit [themselves] to inquiring whether the district judge's actions amounted to an abuse of discretion" in assessing rule of completeness determinations). And regardless whether Williams's exculpatory statements were admitted in earlier proceedings, we can discern no abuse of discretion in the district court's conclusion that Williams's statements that he didn't know anything about the gun, but was just bringing the car back to his "girl," did not "explain" his subsequent confession, and were thus not necessary to correct a misleading impression arising from the admission of his inculpatory statements alone. We note, too, that Williams's third trial was the *first* occasion on which the government called Hosam, who explained how Williams came to be driving the car she had rented and who disclaimed any knowledge of the loaded weapon in that car. It is thus highly speculative, at best, to contend that the conviction here resulted from exclusion of exculpatory portions of Williams's post-arrest statements, when a more pertinent difference between the third trial

and its predecessors was the introduction of direct testimony to the effect that the weapon in the car was in no way associated with the person who had rented the vehicle.[7]

The analysis here is also sufficient to explain why Williams's Fifth Amendment claim is meritless. Williams cites a footnote from this Court's decision in *Marin*, which states that "when the government offers in evidence a defendant's confession and in confessing the defendant has also made exculpatory statements that the government seeks to omit, the defendant's Fifth Amendment rights may be implicated." *Marin*, 669 F.2d at 85 n.6. But even assuming *arguendo* that the Fifth Amendment is implicated in such circumstances, *Marin* itself makes clear that this is only when the statement offered by the government is *misleading* by virtue of the portion it omits. *See id.* ("In such circumstances . . . the Fifth Amendment right to remain silent is violated when the omission paints a distorted picture . . . which the defendant is powerless to remedy without taking the stand." (internal

---

[7] Indeed, even if we were to conclude that the district court *had* erred in excluding Williams's self-serving denials, we would also conclude in light, *inter alia*, of Hosam's testimony, that reversal is not required because any such error did not affect Williams's substantial rights. Fed. R. Crim. P. 52(a); *cf. Sutton*, 801 F.2d at 1370–71 (noting that although defendant should have been permitted to introduce excluded portions of his recorded conversations, such error did not require reversal where "substantial rights" were unaffected and error "did not substantially influence" the verdict).

quotation marks and brackets omitted)). As already noted, the district court did not err in concluding that Williams's confession was *not* misleading and that the omitted exculpatory portions of his post-arrest statements did not explain that confession, which was "simply a reversal of his original position." A-244. Thus, Williams's Fifth Amendment claim is also without merit.

## B. The "Gang" Evidence

### 1. Williams's Post-Arrest Statements

Williams next argues that the district court erred in admitting his statements to police, made *after* he confessed to possessing the gun, that he was a member of the Crips gang and was "willing to work" with police to "get firearms and narcotics." GA-105. Before trial, the government moved *in limine* to admit (1) evidence that Williams had previously used the center console of a Nissan to hide fraudulent credit cards; and (2) these post-arrest statements.[8] The district court granted the motion in part, permitting the post-arrest statements to be admitted but not the evidence about Williams's prior use of the center console. On appeal, Williams argues that the statements constituted impermissible propensity

---

[8] Williams thus had ample pretrial notice that the government intended to offer this evidence at trial. *See* Fed. R. Evid. 404(b).

33

evidence pursuant to Fed. R. Evid. 404(b) and were unfairly prejudicial under Fed. R. Evid. 403. Appellant Br. 42. For the following reasons, we again disagree.

Rule 404(b) states that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b). In other words, "Rule 404(b) bars the admission of defendant's uncharged crimes to prove propensity to commit the crime charged." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992). At the same time, pursuant to this Circuit's "inclusionary approach" to such evidence, other-crimes evidence *is* admissible if offered "for any purpose *other than* to show a defendant's criminal propensity." *United States v. Mejia*, 545 F.3d 179, 206 (2d Cir. 2008) (emphasis added). And our review of the district court's admission of such evidence is limited: "We review . . . for abuse of discretion, and the district court's ruling stands unless it was arbitrary and irrational." *Id.*

Here, Williams's admission of gang membership and offer to assist police in finding drugs and weapons was admitted not to show that he had a propensity to act in a particular way, but to meet the defense argument that Williams's "so-called" confession was not a confession at all, Trial Tr. 225, because "we don't

34

know from the face" of the written confession "what that means when he says, I had the gun." Trial Tr. 228–29. More specifically, the defense argued at trial that Williams did not confess, and that his handwritten statement, "I had the gun," was not an admission to knowing possession of the weapon, but simply an acknowledgment by Williams that he was driving the car in which the gun was found:

> Let's focus on this business about "I had the gun," okay? What does that mean? Does that mean I knew the gun was in the console that day? No.
> I was driving the car. They say they found the gun in the car. I guess I had the car. . . .

Trial Tr. 226 (defense summation). Williams's statements to police shortly after executing his handwritten confession rebutted this argument by suggesting, instead, that Williams first admitted to knowing possession of the loaded firearm and then, contemporaneously with this admission, sought to curry favor with police by telling them that he was in a position to cooperate in other cases. *Cf. United States v. Inserra*, 34 F.3d 83, 89 (2d Cir. 1994) (noting that other-crimes evidence may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense").

District courts have significant discretion in determining whether other-

crimes evidence is admissible for a proper purpose. *See United States v. Mercado*, 573 F.3d 138, 141–42 (2d Cir. 2009). Here, Williams's post-arrest offer to assist police tended to clarify that his written statement "I had the gun" was not an admission to haplessly driving a car with a gun in it when he spoke to police, as his counsel contended in summation, but was instead an acknowledgement that Williams *knowingly* possessed the weapon in the Nissan, as he admitted to police orally before offering to assist them in making other cases.[9] *Cf. United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007) (admitting evidence of uncharged criminal conduct in order to clarify another statement that otherwise "ma[d]e no sense"). Williams's statement that he was in a gang and in a position to assist police in locating drugs and guns was also independently probative as to Williams's intent to possess the loaded weapon found in the Nissan that day, and as to his opportunity to obtain a weapon. Intent and opportunity are proper purposes under Rule 404(b), and courts routinely admit evidence of gang membership in circumstances like these where the evidence is relevant for a proper purpose. *See, e.g.*, *United States v. Gordon*, 496 F. App'x 579, 582–83 (6th Cir. 2012) (admitting

---

[9] Notably, Williams's oral admissions, as described by Detectives Latorre and Fichter at trial, had none of the ambiguity of his written confession. *See, e.g.*, GA-47 ("It was mine, I wasn't going to hurt anybody with it, I'm sorry.").

36

evidence of gang membership as relevant to motive and opportunity to possess a gun); *United States v. Santiago*, 46 F.3d 885, 889–90 (9th Cir. 1995) (admitting evidence of gang membership as "relevant to the issue of motive"); *United States v. Mills*, 704 F.2d 1553, 1559–60 (11th Cir. 1983) (same); *see also United States v. Jobson*, 102 F.3d 214, 221 (6th Cir. 1996) ("We hold . . . that defendant's gang membership would be admissible to establish his opportunity to commit the crime [of gun possession].").

Williams's claim that the challenged statements were unfairly prejudicial under Rule 403 is also unavailing. Rule 403 provides that evidence may be excluded "if its probative value is substantially outweighed by a danger . . . of unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. As outlined above, the statements were probative for non-propensity purposes. And the district court mitigated any potential prejudice by issuing a limiting instruction restricting the jury's use of the gang-affiliation evidence to proper Rule 404(b) grounds, telling the jury "not [to] consider it for any other reason whatsoever." GA-127; *cf. Mercado*, 573 F.3d at 141–42 (declining to conclude that district court abused its discretion in admitting other-crimes evidence that was "relevant and highly probative as to knowledge and intent" and was

"accompanied by a careful and thorough instruction limiting the evidence to relevant Rule 404 grounds"). The district court's "first hand exposure to the witnesses, jury, and other evidence" at Williams's trial put it in a "superior position to evaluate the likely impact" of the challenged statements on the jury. *See Mercado*, 573 F.3d at 142 (quoting *Li v. Canarozzi*, 142 F.3d 83, 88 (2d Cir. 1988)). The court decided that the statements were not unfairly prejudicial and we decline to second-guess that decision.

### 2. The Facebook Images

Williams argues, finally, that the district court erred in admitting images from his Facebook page. The images depict Williams making hand signs—signs that Detective Fichter testified were gang signs, based on the detective's "training and experience as a gang squad detective." GA-109. Williams contends, as he did with his post-arrest statements, that these images constitute impermissible propensity evidence. The government argues in response that Williams waived this argument by intentionally declining to raise it during trial. We agree with the government.

To preserve an evidentiary claim on appeal, a party must "timely object[]" *and* "state[] the specific ground, unless it [is] apparent from context." Fed. R. Evid.

103(a). This Court "ordinarily applies Rule[] 103(a) strictly," and where a party "made no objection that clearly stated the specific ground now asserted on appeal," a claim of error is "unavailing." *United States v. Hutcher*, 622 F.2d 1083, 1087 (2d Cir. 1980) (quoting *United States v. Rubin*, 609 F.2d 51, 62–63 (2d Cir. 1979)). Here, when the government moved to admit the Facebook images, Williams made a "general objection." GA-107. The following colloquy was then held at side bar:

> THE COURT: All right. As I understand, your only standing objection that you've made to this was based on the delay that the government exhibited in seeking the search for it. Is there another basis . . . ? Because you said my general objection.
>
> MR. PADDEN: I meant my previous objection, my previous motion.
>
> THE COURT: So you don't have a relevance objection or anything like that. It was simply the objection that was lodged in your papers?
>
> MR. PADDEN: Yes.
>
> THE COURT: Only that?
>
> MR. PADDEN: Yes.
>
> THE COURT: All right. Then [if] that's the only objection, then the objection is overruled.

GA-107. This exchange demonstrates that Williams did not make an objection clearly stating the impermissible-propensity-evidence grounds now asserted on appeal. The objection was thus not preserved at trial.

Where an objection has not been preserved, this Court has "discretion to correct errors that were *forfeited* because not timely raised in the district court, but no such discretion applies when there has been true *waiver*." *United States v. Spruill*, 808 F.3d 585, 596 (2d Cir. 2015) (citing Fed. R. Crim. P. 52(b); and *United States v. Olano*, 507 U.S. 725, 731–34 (1993)). The distinction between forfeiture and waiver is therefore crucial, because "forfeiture does not preclude appellate consideration of a claim in the presence of plain error, whereas waiver necessarily 'extinguishes' the claim altogether." *United States v. Yu-Leung*, 51 F.3d 1116, 1121 (2d Cir. 1995) (citing *Olano*, 507 U.S. at 733). A claim is forfeited "when a defendant, in most instances due to mistake or oversight, fails to assert an objection." *Spruill*, 808 F.3d at 596. A claim is waived, on the other hand, when a defendant makes an "intentional decision not to assert a right" or, put another way, "act[s] intentionally in pursuing, or not pursuing, a particular course of action." *Id.* at 597. And our caselaw makes clear that an identifiable tactical benefit is not a

"prerequisite to identifying waiver where the totality of circumstances otherwise demonstrate the requisite intentional action." *Id.* at 599.

The totality of the circumstances here convincingly shows that Williams acted intentionally in declining to object on any grounds other than the government's alleged undue delay. The district court specifically asked Williams not once, but twice, if he had any other objections—whether based on "relevance" or "anything like that." GA-107. Williams confirmed both times that he had no other objections. *Cf. Spruill*, 808 F.3d at 599 (finding true waiver where defendant's counsel did not "fall asleep at the wheel" but instead "actively engaged in the matter and agreed to every action taken by the district court"). This is enough to resolve the issue. The argument that the Facebook images constituted impermissible propensity evidence is waived.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.