[Cite as *State v. Johnson*, 2022-Ohio-1733.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                    :

      Plaintiff-Appellant,            :

                                                        No. 21AP-222

v.                                               :               (C.P.C. No. 20CR-4267)

Tavaryyuan Johnson,                              :               (REGULAR CALENDAR)

      Defendant-Appellee.            :

---

D E C I S I O N

Rendered on May 24, 2022

---

**On brief:** *G. Gary Tyack*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellant. **Argued:** *Seth L. Gilbert*.

**On brief:** *Probst Law Office, Inc.*, and *Michael S. Probst*, for appellee. **Argued:** *Michael S. Probst*.

---

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1} Plaintiff-appellant, State of Ohio ("the state"), appeals the judgment of the Franklin County Court of Common Pleas granting the motion to suppress filed by defendant-appellee, Tavaryyuan Johnson. This case involves a challenge to the scope of an inventory search of an impounded automobile following the lawful arrest of the driver. Because the officers conducted the initial search of the vehicle in compliance with the police department's reasonable standardized policy, and because they limited that search to "reasonably accessible areas" as set forth in the policy, the officers did not exceed the scope of a lawful inventory search. We reach this conclusion even if the officers may also have had an investigative motive when they conducted the inventory search. Consequently, the trial court erred when it suppressed the evidence discovered in the inventory search and

the subsequent investigative search. We reverse the judgment of the trial court and remand the case for further proceedings.

**Facts and Procedural History**

{¶ 2} On September 11, 2020, a Franklin County Grand Jury indicted appellee on charges of possession of heroin in violation of R.C. 2925.11, a felony of the first degree; possession of cocaine in violation of R.C. 2925.11, a felony of the first degree; and designing a vehicle with a hidden compartment used to transport a controlled substance in violation of R.C. 2923.241, a felony of the second degree. Each of the drug possession charges was accompanied by a major drug offender specification and a forfeiture specification.

{¶ 3} On November 10, 2020, appellee filed a motion to suppress all evidence seized pursuant to a warrantless search of his vehicle allegedly conducted in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Section 14, Article I of the Ohio Constitution. Appellee argued that the search of his vehicle was not legally justified either as a search incident to arrest or as an administrative inventory search following impoundment of his vehicle. Appellee also sought suppression of incriminating statements he made during the traffic stop. Appellee alleged that the statements were made in violation of his rights under the Fifth Amendment to the United States Constitution.

{¶ 4} The state filed a memorandum contra on December 30, 2020, arguing that the search of appellee's vehicle was lawful under both the automobile exception to the warrant requirement and as a search incident to arrest. Alternatively, the state argued that the lawful impoundment of appellee's vehicle necessitated an administrative inventory of its contents, and that such inventory was conducted in accordance with the Columbus Police Department's Impounding and Towing Directive ("the CPD policy") in effect at the time of the incident. The state further asserted that even if the search violated the Fourth Amendment, the exclusionary rule did not bar admission of the seized evidence because the officers acted in good faith. Finally, the state maintained that appellee's Fifth Amendment rights were not violated because he was not interrogated during the traffic stop about the drugs recovered from his vehicle.

{¶ 5}   On April 7, 2021, the trial court held an evidentiary hearing on the motion to suppress as related to the search of the vehicle.[1]  The following facts were developed at that hearing.[2]

{¶ 6}   At 1:26 a.m. on September 4, 2020, Officer Kenneth Sanders was on patrol when he observed a vehicle with only one functioning headlight traveling westbound on Sullivant Avenue.  Sanders ran the vehicle's license plate through LEADS and discovered that the driver's license of the vehicle's registered owner was suspended.   Based on that information, Sanders initiated a traffic stop of the vehicle.  Sanders approached the vehicle, informed the driver of the reason for the stop, and asked him to produce his driver's license. After verifying that the driver, identified as appellee, was the registered owner of the vehicle, Sanders placed him under arrest for driving under suspension.

{¶ 7}   During a search of appellee's person incident to the arrest, Sanders found a large sum of cash and an empty cellophane baggie in appellee's pocket.  Sanders testified that when he removed the baggie from appellee's pocket, appellee said that it was an empty "bag of weed."  (Apr. 7, 2021 Tr. at 22, State's Ex. D.)  Sanders did not inquire about the contents of the baggie and could not recall if the baggie contained any marijuana residue, seeds, or stems.  The cash was separated into "small bundles" consisting of "a couple hundred bucks" per bundle; when questioned by Sanders, appellee stated that he did not know how much money he had on him.  (Tr. at 12.)  Sanders asked appellee where he was employed; appellee responded that he was a self-employed painter.

{¶ 8}   Sanders cited appellee for the headlight violation and driving while under FRA and OVI suspension and impounded appellee's vehicle pursuant to Section II (A)(1) of the CPD policy.  That section permits the impounding of a vehicle for "any of the reasons stated in the Columbus City Code Section 2107.01."   Columbus City Code Section

---

[1]  There is no mention of the alleged Fifth Amendment violation at the suppression hearing.

[2]  The record of the suppression hearing includes the parties' stipulation to the CPD policy.  (State's Ex. A.) In addition, the record includes the parties' stipulation to photographs of appellee's vehicle taken by the CPD during daylight hours at the impound lot on March 10, 2021. (State's Ex. F1-18.)  The record also includes a photograph of the interior of appellee's vehicle taken by the CPD on September 4, 2020 at the scene. (State's Ex. G.)  In addition, the record includes the CPD's criminal investigative summary packet. (Def.'s Ex. 1.)  The record also includes DVDs containing footage from body cameras worn by three CPD officers involved in this case—Officers Kenneth Sanders (State's Ex. D and Def.'s Ex. 2), Jared Randall (Def.'s Ex. 4), and Robert Franklin (State's Ex. E). Sanders and Franklin testified at the hearing; Randall did not testify.

2107.01(C) authorizes law enforcement officers to impound "any vehicle from which the driver has been arrested."

{¶ 9}   At the suppression hearing, Sanders explained that when a registered owner of a vehicle is arrested for driving under suspension, impounding the vehicle is "part of the seizure packet." (Apr. 7, 2021 Tr. at 16.)  According to Sanders, "[w]e always impound if we place the driver under arrest for driving with no license." *Id.*  Sanders outlined the process involved in inventorying an impounded vehicle pursuant to the CPD policy.  To that end, Sanders testified that "you go through [the vehicle's] contents, any containers inside the vehicle that are reasonably accessible.  You document it and go through its contents, see if there's anything of value that needs to be removed, to prevent accusations of theft.  That's a primary use of our body cameras, to show that [the officers are] not destroying property or taking [property]." *Id.* at 37.

{¶ 10}  The CPD policy referenced by Sanders sets forth specific procedures to be followed after a vehicle is impounded.  As relevant here, officers must "[c]onduct an inventory of the contents of all reasonably accessible areas and containers in the vehicle, and complete an Impounded Vehicle Inventory, form A-32.107."  (CPD policy, Section III(A)(1)(d)).  Officers must also "[l]ist the inventoried property in the Property in Vehicle section of the form, and mark its disposition."  (CPD policy, Section III(A)(1)(d)(3)).  In addition, officers must "[r]etrieve the following property from the vehicle for submission to the PCU[3]: (1) Contraband[,] (2) Weapons[,] (3) More than $20 in currency bills[, and] (4) Any other property of high value or subject to theft, unless it can be secured in a locking compartment or trunk."  (CPD policy, Section III(A)(1)(e)(1-4). (Emphasis omitted.)

{¶ 11}  At Sanders' request, Officers Robert Franklin and Jared Randall performed the inventory search of appellee's vehicle.  Franklin testified that he first checked the front passenger area, including the door, the floor, the glove compartment, and "containers in the vehicle that are accessible." (Apr. 7, 2021 Tr. at 54; State's Ex. E.)  Franklin's testimony in this regard is consistent with the footage from his body camera.  He also testified that he "thumbed through the pages" of the vehicle manual located in the glove box because he "didn't want to be responsible for missing cash or anything like that." *Id.* at 54-55; State's Ex. E.  After Randall told Franklin he had discovered a "ton more cash" on the driver's side

---

[3] "PCU" is an acronym for Property Control Unit.

of the vehicle, Franklin began searching the center console. *Id.* at 62; State's Ex. E. In doing so, he noticed that an access panel located on the lower portion of the passenger side of the center console was "sitting ajar," in that "[t]he bottom of it was not fully in place." *Id.* at 55, 63; State's Ex. E. Upon closer inspection, Franklin noted that the area around the access panel was covered in grime; however, the edge of the panel appeared to be lighter in color, "like it had been opened and closed." *Id.* at 55. Franklin testified that he normally does not inspect access panels during an inventory search; however, he did so in this case because it "was sitting open" and appeared to have been "manipulated" and "used as a container frequently." *Id.* at 72, 56.

{¶ 12} Franklin touched the access panel with his finger "for the purpose of trying to open it"; however, he did not "manipulate" or "grab" it. *Id.* at 55, 80. When he touched the access panel, it "fell off." *Id.* at 55. Franklin surmised that the access panel detached so easily because the latch had been "[worn] down" from "multiple" usage. *Id.* Franklin acknowledged that the footage from his body camera does not show precisely how he touched the access panel or how readily it detached. Rather, the footage only depicts the access panel as originally attached, as it later lay on the passenger area floor, and the exposed opening following detachment. *Id.* at 64; State's Ex. E.

{¶ 13} Franklin assumed the access panel was designed for maintenance purposes. After the access panel detached, he illuminated the opening with his flashlight. He did not observe anything inside the opening that he thought might be illegal contraband; rather, he observed "a metal piece kind of across the top right corner of that panel and a large opening underneath." *Id.* at 56, 57; State's Ex. E. He then reached inside the opening, "patted around," and discovered what he believed from his training and experience to be a bag of heroin. *Id.* at 56; State's Ex. E. He recovered a second bag of heroin a few seconds later. *Id.* at 57; State's Ex. E. Following discovery of the heroin, Franklin remarked to Randall, "Finally, one of the good hiding places." *Id.* at 70; State's Ex. E. At the hearing, Franklin explained this statement to mean that when conducting an inventory search he imagines where he would hide contraband; however, until the discovery in the instant case, what he imagined to be good hiding places had never been utilized. When he put his hand in the opening, he was "not really expecting to find anything," which made the discovery "even more surprising for me." *Id.* at 71.

{¶ 14} Franklin placed the bags of heroin on the dashboard and notified Sanders of the discovery. Sanders took photographs of the inside of the vehicle, including the bags of heroin on the dashboard. (State's Ex. G.)  Due to the large volume of drugs recovered, Sanders sought, and ultimately obtained, authorization from the narcotics bureau to continue the search.  Thereafter, Franklin and Randall noticed that the instrument panel surrounding the radio and heating/cooling controls appeared to be loose, "like it had been removed and put back into place."  (Apr. 7, 2021 Tr. at 58; State's Ex. E.)  Randall removed the instrument panel and found another bag of narcotics "behind the plastic surrounding the heater unit."  *Id.* at 58.

{¶ 15} On cross-examination, Franklin acknowledged that footage from his body camera reveals statements he made indicating that he did not believe that appellee owned a painting business or that the cash recovered from appellee's person and vehicle derived from that enterprise.  He also averred that he examined the vehicle manual and other documents while "looking for money." *Id.* at 77.  He further testified that he read paperwork discovered in the vehicle "to make sure I'm not leaving behind any kind of important documentation that he may want out of the vehicle." *Id.* at 79.  He denied, however, that he was searching for drugs while conducting the inventory search.  He admitted that he was "excited" when he discovered the drugs because it was such a large amount. *Id.* at 83, 89. He testified that he relied on the CPD policy to support his decision to reach inside the access panel after it detached.  Regarding a statement captured on his body camera footage that "[t]here might still be a bag of heroin down there. That's what we were initially looking for."  Franklin explained that he was referring to Randall's decision to remove the instrument panel after Franklin found the first bags of heroin.  Franklin conceded that he did not document the items he recovered from the vehicle; rather, he told Sanders "what I remembered." *Id.* at 78.

{¶ 16} Following the inventory search, Sanders completed the inventory form to "document any items removed from the vehicle, any valuable items in the vehicle, [and] document any damage outside the vehicle and inside the vehicle" in order to safeguard officers from accusations of theft or property damage. *Id.* at 17-18.  Prior to completing the form, Sanders "looked at the contents [of the vehicle], spoke with the officers, documented what I saw and what they said." *Id.* at 41.  The inventory form indicates that Sanders

completed it on September 4, 2020 at 2:28 a.m., and itemized the following as "Property in Vehicle": baggies containing 237.3 grams of "black tar [heroin]"; baggies containing 318.2 grams of "white rocks [cocaine]"; 9 mm and 7.62x39 ammunition; and miscellaneous items such as CD's, Christmas ornaments, miscellaneous tools, car stereo, cloths, jacket, trash, gloves, and masks. (State's Ex. C.) The form does not mention any cash recovered from the vehicle.[4]

{¶ 17} At the hearing, Sanders acknowledged Franklin's statement to Randall about finding a "bag of heroin down there, that's what we were initially looking for." (Apr. 7, 2021 Tr. at 40; Def. 's Ex. 2). When asked whether Franklin ever told Sanders that he "was trying to look for heroin in the car," Sanders responded, "No." *Id.* at 41. Sanders testified that the search of the vehicle was "[i]nitially, * * * purely an administrative inventory" and not a probable cause search incident to arrest. *Id.* at 44. He further testified that cash recovered from appellee's person and vehicle totaled $3,156.38; the CPD's investigative summary packet confirms Sanders' testimony. (Def.'s Ex. 1.) Sanders conceded that at the time he placed appellee under arrest, no evidence established that the cash found in appellee's pockets was tied to illegal activity.

{¶ 18} Following the hearing, and in accordance with the trial court's directive, the parties submitted post-hearing memoranda. In those submissions, the parties essentially reiterated the arguments advanced in their pre-hearing memoranda. Subsequent to those filings, the trial court held a non-evidentiary hearing on April 23, 2021.

{¶ 19} At that hearing, the trial court set forth a lengthy and detailed recitation of the facts. The court first found that the police had valid reasons for the traffic stop, the subsequent arrest of appellee, and the search of appellee's person incident to his arrest. The court further found that the pat-down search of appellee's pockets yielded a significant amount of cash and an empty cellophane bag that appellee voluntarily admitted was his "weed bag." (Apr. 23, 2021 Tr. at 7.) The court also found that no testimony established that appellee made any furtive movements, attempted to conceal anything inside his vehicle, or that the odor of marijuana emanated from him or his vehicle. In addition, the

---

[4] Footage from Randall's body camera reveals his statement estimating that 99 percent of the cash recovered was from appellee's pockets; a relatively small amount of $1's and $5's were recovered from the vehicle. (Def.'s Ex. 4.)

court found that Sanders testified that the police did not have probable cause to search appellee's vehicle.

{¶ 20} The court next discussed and made factual findings regarding the impounding of appellee's vehicle and associated inventorying of its contents. Specifically, the court found that Sanders' decision to impound the vehicle was authorized by the CPD policy. The court further found that the CPD policy permits officers to inventory the contents of all reasonably accessible areas and containers in the vehicle; however, the court noted that the CPD policy does not define "reasonably accessible areas" or "containers," and does not state whether the inventory form must be completed contemporaneously with performing the inventory. *Id.* at 9. The court expressed concern about the CPD policy's deficiency regarding the latter issue: "if the police are filling out an impound form as they search a vehicle and go through it, it kind of makes sense. It's not a pretext for a search; it's more of an inventory. Whereas, if they are rummaging through the vehicle just going through items not recording anything, seems like it's more of a general search and it's kind of a pretext to look for things, look for contraband." *Id.*

{¶ 21} The court next found that footage from the officers' body cameras revealed no contraband in plain view and that Franklin expressed skepticism that the large sum of cash recovered from appellee's pockets and vehicle derived from his painting business. The court found that an inference could be drawn from this comment that Franklin was "hoping that [he] find some contraband" while inventorying the vehicle. *Id.* at 10. The court also found that had the officers believed that the cash found in appellee's pockets was linked to drug possession, they could have requested assistance from the CPD's K-9 unit.

{¶ 22} Next, the trial court discussed the evidence (including Franklin's testimony and photographs of the vehicle taken at the impound lot) relating to the location and appearance of the access panel. The court particularly noted State's Ex. F-16, which provides an unobstructed view of the intact access panel. The court stated that "it does look like something that can be opened." *Id.* at 12. Thereafter, the court recounted Franklin's testimony that the access panel looked worn as if it had been recently opened. The court stated, "I don't know that you can really tell that. You can see some scratches and some marks on it. The bodycam does show the bottom part of the area sticking out just a little bit." *Id.*

{¶ 23} The court then noted Franklin's testimony regarding his physical contact with the access panel. Specifically, the court averred, "[Franklin] basically said, I reached over to - - I was going to open it, but I touched it and the lid - - the panel that covers the opening fell to the floor." *Id.* The court further stated, "Now you can't really see that totally because he's bent over in a position to get it." *Id.* The court continued, "But once the panel falls off - - and * * * I think he's telling the truth. I think that's what happened. But once that happened, [State's Ex.] F17 shows what he would have seen. And [State's Ex.] F17 shows wiring, some kind of copper metal and it looks like the fuse box." *Id.* at 12-13.

{¶ 24} The court then stated, "Once the panel came off, he looked inside. He didn't see anything. There was nothing in plain view. And I believe [State's Ex.] G, which was taken at the scene, actually gives you a better view of what he would have seen. You see exactly where the area is. And it's obviously very close to the floor. And * * * as soon as the lid comes off of it, or the panel that accesses it, it's obvious it's not a storage area. It's not an area designed to hold items, like a glove box, like a console." *Id.* at 13. Continuing, the court averred, "It's also interesting that once it comes off, he reaches his hand all the way up into the gearbox and then discovers bags of drugs. So he has to reach in, go up - - and you * * * can't even really totally see that on the bodycam because he's bent over again. And I would note that I suppose an argument could be made it's readily accessible, but it's on the passenger side floor. It's not an area that you would generally store anything in." *Id.* at 13-14.

{¶ 25} Recalling Franklin's testimony that he was excited when he discovered the drugs inside the access panel, the court stated, "I get that. He's a fairly new officer. It is the officer's job to * * * try and ferret out crime and discover drugs. And if you make a major felony arrest on drugs, of course, an officer is going to be somewhat excited. That's the whole purpose of them to be out there to prevent crime. So he's pretty excited. He's like, wow, you know, this is one of the first times I've ever found something in a good hiding place, which to me kind of indicates the mindset is this isn't a storage area. He knows that. It's a hiding place." *Id.* at 14.

{¶ 26} The court then stated, "And at the point he takes the panel off he's conducting a search for contraband. He's not looking for something to record and safeguard as part of the inventory. Nor was there anything in plain view. Why do I say that? Because * * * the

bodycam of Franklin at 8:34 is the point where Franklin puts his hand back, reaches up under, finds the drugs, starts talking about it. And Officer Randall, being the experienced officer, is like [c]ould you see it?" *Id.* at 14-15. The court then averred, "you can draw the inference from that statement that Randall is like, well, if it's in plain view * * * there's an exception. What does Franklin say? No, couldn't see it." *Id.* at 15.

{¶ 27} Following its recitation of facts, the trial court turned to an application of the law to those facts. The court first considered the state's contention that the officers had probable cause to search the vehicle because the search of appellee incident to arrest yielded a large sum of cash and an empty cellophane bag that appellee stated was a weed bag. The court rejected that argument on grounds that "there was no testimony from any officer that I'm an experienced officer. I made a number of drug arrests. When you have cash like this folded over like this in small denominations, it can be associated with drugs. People sometimes hide drugs in a vehicle. It's 1:00 a.m. It's a high-crime area. None of that kind of testimony. I'm not even totally sure that would be enough. But there was none of that testimony. And again, tellingly, they felt they didn't have probable cause to search. * * * Again, that's not the end-all be-all, because the law says it's an objective test." *Id.* at 15-16.

{¶ 28} Noting that probable cause to search a vehicle requires specific, objective facts that the vehicle contains contraband or evidence of a crime, the court stated that "[a]ll we have is an individual who has an empty bag that he says is his weed bag. He doesn't say I just used all the weed in the bag. There wasn't any residue in the bag. There's nothing to tie the weed bag to the belief there would be drugs in the car. Probable cause cannot be based upon a hunch or speculation or mere suspicion. Here it's mere suspicion. Now, people might say large amount of cash, he claims it's his empty weed bag. That doesn't amount to probable cause. Did it give the officer some reason [to] be a little bit skeptical of * * * a lot of cash? People that have a lot of cash, might be a drug dealer." *Id.* at 16-17.

{¶ 29} The court continued, "[w]ell, what could they have done? They could ask him, [i]s there any drugs in the car? You know, instead they find a painter's card indicating that he owns his own business, which kind of corroborates his story. And who knows? It would be speculation. Was the money from doing cash work as a painter or could it have been from selling drugs? They didn't ask him. They could have brought a dog to sniff the car. That's easy to do. Could have got a K-9. They didn't do that." *Id.* at 17. The court

further stated: "They didn't see anything in the car. There was no odor of marijuana in the car, which would have given them probable cause. The defendant's demeanor did not lead the officers to believe that he was nervous that he might have something to hide. None of those things applied." *Id.*

{¶ 30} The court next addressed the state's argument (considered by the court to be the "stronger argument") that "the search was conducted pursuant to a reasonably standard inventory policy and done in good faith." *Id.* at 18. As to the CPD policy itself, the court took issue with the state's argument (as characterized by the court) that "if you have a policy and you use the policy, that's the end-all be-all." *Id.* The court stated, "[T]hat's not correct. Because if that was true, you could have a policy that said, well, you can tear out the seats and you can look underneath the seat because people could store things there." *Id.*

{¶ 31} The court further averred, "[t]he policy has to be a reasonable policy." * * * So you can't rely on a policy that's not reasonable. And it has to be pretty clear. This policy is a little bit vague. It does not seem on its face all that unreasonable. It doesn't define what a reasonably accessible area is. Accessible to who? The driver? And what is a reasonably accessible area? It doesn't define containers. Doesn't deal with whether a container is locked or not. But the argument is * * * the police had the authority to pull the cover of this area in question because it might be reasonably accessible and contain valuables." *Id.* at 18-19.

{¶ 32} The court then considered the reasons for an inventory policy: "[i]t's designed to produce an inventory. It's to protect the police and the owner of the vehicle from either false claims or damage to the vehicle. * * * So the idea is you are going to search areas where there might be something of value, personal property, stored so it can be logged in." *Id.* at 19. The court further stated, "the inventory search must be conducted in good faith, not merely as a pretext for an evidentiary search of the vehicle to be impounded. * * * A search conducted with an investigatory intent does not constitute an inventory search." *Id.* at 19-20.

{¶ 33} The court next questioned how a court would "determine whether it's a pretext or it's pursuant to the policy?" *Id.* at 19-20. Answering its own question, the court stated, "I think you can look to the actions and statements of the officers. And I do think in their minds, [w]ell, this is an inventory search. But I think also the evidence would allow

you to infer that they suspect drugs are there and they are kind of looking for drugs." *Id.* at 20.

{¶ 34} The court then referenced its earlier statement that the CPD policy does not address when the inventory form must be completed. The court cited to a magistrate judge's decision in *United States v. Gibson*, 2:16-cr-333-JAD-VCF, 2017 U.S. Dist. LEXIS 49363 (D.Nev. Mar. 7, 2017),[5] which, according to the trial court, "found it of significance that the inventory form was kind of just generally filled out and it was not filled out contemporaneously. They didn't write down findings in a notebook or otherwise memorialize the results of the search." (Apr. 23, 2021 Tr. at 20.) Further referencing *Gibson,* the court noted that the officer in that case "testified it was his customary practice to remember what items he had found, then complete the impound report later. The Court found that significant. The Court said * * * if you are really doing an inventory search and you are trying to log all the items, you should be doing it at the same time. [The Court] said at no time did either officer document on the form what items were found where. And [the Court] found that significant." *Id.* at 20-21.

{¶ 35} The court likened the instant case to *Gibson*: "Same thing is true in this case. [The officers] were asked, [w]hy weren't you making a list of the items? [The officers] said, well, we do that later from memory." *Id.* at 21. The court also noted that the inventory form, State's Ex. C, does not document where in the vehicle the drugs were discovered or that cash and coins were found inside the vehicle. Regarding these deficiencies, the court stated, "if you are making an inventory to protect yourself against claims, you should be saying this amount of cash was found in the vehicle. This amount of cash was found on him. This amount of coins was there. These items were found there." *Id.* at 21-22.

{¶ 36} The court further averred, "It does lend some support and allow me to draw an inference that, yes, they were doing an inventory search, but they were also kind of using it as an excuse to look for drugs as a pretext. Also, the case law says you can't use an inventory search as a ruse for general rummaging in order to discover incriminating evidence. That kind of looks like what they are doing here on the bodycam. They are just going through items. Now once in while they'll look at an item and read it. And the officer

---

[5] The magistrate judge's decision was affirmed, in relevant part, in *State v. Gibson*, 2:16-cr-00333-JAD-VCF, 2017 U.S. Dist. LEXIS 126956 (D.Nev. Aug. 10, 2017).

did testify, well, in case it was some important paper to give him. But it looks like rummaging to me." *Id.* at 22.

{¶ 37} Continuing, the court stated, "So if you are conducting an inventory search, you would look for things in places that people store things - - glove box, the console, not the fuse box. * * * That is a hidden area. * * * [I]f you are looking for drugs, you might be searching that area. And I suppose if you take the prosecution's argument to its logical conclusion, Hey, it's a reasonably accessible area. Why not pull the lid off the gas tank and stick a camera down there? Because that's accessible. But people don't store things there unless it's contraband. * * * Also, the policy, if you are arguing it's a reasonably accessible area, which is kind of general, can you search the engine compartment, then? Could you pull up the hood, because it's accessible? Could you pull up the carpet? Because I guess you could put stuff under the carpet. No. And you shouldn't be allowed to do that if you are conducting a legitimate inventory search." *Id.* at 22-23.

{¶ 38} Following these observations, the court determined that once Franklin noticed the access panel, it was "legitimate to pull that open [because] [i]t looks like maybe it could be an area you might store something. So I don't really have a problem with the fact that he pulled it, touched it, and it fell." *Id.* at 23. However, the court took issue with Franklin's subsequent actions: "[O]nce he saw it was not a storage area and it was a fuse box, and nothing was visible, that becomes a search. He's actually searching now for contraband. And if he really thought there was contraband in there, he should have got a dog to come and sniff the vehicle. And * * * in addition to all that, [I] still believe this was kind of a pretext to rummage through the vehicle because that's what it looks like to begin with." *Id.* at 23-24.

{¶ 39} The court further stated, "I understand maybe opening that panel - - even though I believe they were rummaging and looking for drugs, because in the back of their mind they thought there'd be drugs. And, again, we can deal with the officer's statements of Hey, I finally found some stuff in a good hiding area. * * * [I]f you are doing an inventory search, you are not looking for a hiding area. And, again, you have the officer's statement, Did you see it? Like the experienced officer knows, plain view is an exception to the warrant requirement. But he didn't see it. All you could see when you took it off is visible in the picture, and it's a fuse box, wires, and access to the gear shift. It's not an area where you

would expect valuables to be stored to record for an inventory search. And once * * * he took the panel off, it's immediately apparent that it's not a container or storage area. There's internal wiring." *Id*. at 24-25.

{¶ 40} The court ultimately concluded:

> So the Court concludes that there was not probable cause for the search. The Court does not find an exception based on an inventory search. The Court finds no other exceptions and generally the rule is you have to have a warrant. Vehicles are excepted out because they are easily moved.
>
> But you can't just search a vehicle when you pull a vehicle over. It either has to be based on probable cause, or if you see furtive movements. If somebody looks like they are tucking a potential weapon, you are allowed to conduct a sweep of the car to make sure there's no weapons. That didn't happen here. None of that conduct occurred. And I've gone through, I think, pretty clearly * * * why I don't believe this was a valid inventory search.
>
> So based upon all that the Court does find, the search was in violation of the 4th Amendment. And I order all the drugs suppressed as a result of the search. I believe that should be sufficient for findings of fact and conclusions of law.

*Id*. at 25-26.

{¶ 41} The trial court did not address the state's good-faith argument.

{¶ 42} In accordance with its oral pronouncement, the trial court issued a judgment entry on May 4, 2021 which granted appellee's motion to suppress and ordered suppression of all evidence seized as a result of the illegal search.

{¶ 43} On May 11, 2021, the state filed a notice of appeal pursuant to App.R. 4(B)(4) and R.C. 2945.67(A) with the required certifications under Crim.R. 12(K) that the appeal is not taken for the purpose of delay, and that the ruling on the motion to suppress has rendered the state's proof with respect to the pending charges so weak in its entirety that any reasonable possibility of effective prosecution has been destroyed.

{¶ 44} The state raises one assignment of error for our review:

> The trial court committed reversible error in sustaining the defense's motion to suppress.

**Legal Analysis**

{¶ 45} In its single assignment of error, the state argues that the trial court erred in granting appellee's motion to suppress. " 'Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.' " (Citations omitted.) *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 100, quoting *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8.

{¶ 46} "The Fourth Amendment to the United States Constitution provides, 'The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, particularly describing the place to be searched and the persons or things to be seized.' " *State v. Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶ 13. Article I, Section 14 of the Ohio Constitution contains almost identical language, and the Supreme Court of Ohio has interpreted it as affording at least the same protection as the Fourth Amendment. *Leak*, citing *State v. Hoffman*, 141 Ohio St.3d 428, 2014-Ohio-4795, ¶ 11, citing *State v. Robinette*, 80 Ohio St.3d 234, 238-39 (1997); *State v. Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, ¶ 16, citing *State v. Jones*, 143 Ohio St.3d 266, 2015-Ohio-483, ¶ 12.

{¶ 47} " 'The touchstone of the Fourth Amendment is reasonableness.' " *Leak* at ¶ 14, quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991). " ' "[W]hether a search and seizure is unreasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case." ' " *Id.*, quoting *S. Dakota v. Opperman*, 428 U.S. 364, 375 (1976), quoting *Cooper v. California*, 386 U.S. 58, 59 (1967). " 'Reasonableness, in turn, is measured in objective terms by examining the totality of the circumstances.' " *Id.*, quoting *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

{¶ 48} The Fourth Amendment prohibits all unreasonable searches and seizures. *Banks-Harvey* at ¶ 17, citing *United States v. Ross*, 456 U.S. 798, 825 (1982). " '[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable, under the Fourth Amendment subject only to a few specifically established and well-delineated exceptions.' " *Id.*, quoting *Katz v. United States*, 389 U.S. 347, 357 (1967). "When a defendant moves to suppress evidence recovered during a warrantless search, the state has the burden of showing that the search fits within one of the defined exceptions to the Fourth Amendment's warrant requirement." *Id.* at ¶ 18, citing *Athens v. Wolf*, 38 Ohio St.2d 237, 241 (1974); *Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, ¶ 98 ("[w]hen police conduct a warrantless search, the state bears the burden of establishing the validity of the search").

{¶ 49} At the outset, we note the state's assertion that although there are two searches at issue in this case—the search of the area behind the access panel and the subsequent search of the area behind the instrument panel—the trial court specifically addressed only the first search, finding that it was not supported by either the automobile exception or the inventory-search exception to the Fourth Amendment's warrant requirement. Although the trial court did not expressly address the second search, it appears (because it suppressed all the evidence seized from the vehicle) that it concluded that the discovery of the drugs behind the instrument panel was the fruit of the unlawful first search.

{¶ 50} The state argues that the search of the access panel was lawful under both the inventory-search exception and the automobile exception, the subsequent search of the instrument panel was lawful under the automobile exception, and even if there was a Fourth Amendment violation, suppression of the evidence was improper because the officers conducted both searches in good faith.

{¶ 51} We first address the state's assertion that the search of the access panel fits within the inventory-search exception to the Fourth Amendment's warrant requirement. "The inventory-search exception is a well-defined exception to the Fourth Amendment's warrant requirement." *Banks-Harvey*, 152 Ohio St.3d 368, 2018-Ohio-201, at ¶ 20, citing *Illinois v. Lafayette*, 462 U.S. 640, 643 (1983); *State v. Mesa*, 87 Ohio St.3d 105, 108 (1999). Under this exception, when a vehicle is lawfully impounded, police are permitted

to follow a routine practice of administrative procedures for securing and inventorying the contents of the vehicle. *Id.* at 109. An inventory search is intended to (1) protect an individual's property while it is in police custody; (2) protect police against claims of lost, stolen, or vandalized property; and (3) protect police from dangerous instrumentalities. *Id.*, citing *Opperman*, 428 U.S. at 369 (1976).

{¶ 52} Because an inventory search is an administrative caretaking function unrelated to a criminal investigation, the policy underlying the Fourth Amendment warrant requirement, including the standard of probable cause, is not implicated. *Id.*, citing *Opperman* at 370. Rather, the validity of an inventory search of a lawfully impounded vehicle is judged by the Fourth Amendment's standard of reasonableness; it must be conducted in good faith, and in accordance with reasonable standardized procedures or established routine. *Id.*, citing *State v. Hathman*, 65 Ohio St.3d 403 (1992), paragraph one of the syllabus, citing *Opperman*; *Colorado v. Bertine*, 479 U.S. 367 (1987); and *Florida v. Wells*, 495 U.S. 1 (1990).

{¶ 53} An inventory search of a lawfully impounded vehicle is reasonable under the Fourth Amendment when it is performed in good faith pursuant to standardized police policies and procedures. Such policies and procedures may be established by written rules and regulations or by testimony regarding the department's standard practices. *United States v. Williams*, 930 F.3d 44, 54 (2d Cir.2019). An inventory search conducted pursuant to standard police policy is lawful "when the evidence does not demonstrate that the procedure involved is merely a pretext for an evidentiary search of the impounded vehicle." *Leak*, 145 Ohio St.3d 165, 2016-Ohio-154, ¶ 22, citing *Blue Ash v. Kavanagh*, 113 Ohio St.3d 67, 2007-Ohio-1103, ¶ 11. "A search which is conducted with an investigatory intent, and which is not conducted in the manner of an inventory search, does not constitute an 'inventory search' and may not be used as a pretext to conduct a warrantless evidentiary search." *State v. Caponi*, 12 Ohio St.3d 302, syllabus (1984). Similarly, an inventory search may not be used as a ruse for a general rummaging in order to discover incriminating evidence. *United States v. Torres*, 828 F.3d 1113, 1120 (9th Cir.2016), citing *Wells* at 4 ("[a]lthough a policy may accord the searching officer significant discretion to determine whether a particular recess should be searched, the policy cannot constitutionally authorize

officers to 'rummag[e]' for evidence of criminal activity under the guise of logging an inventory").

{¶ 54} Here, the trial court concluded that Franklin's discovery and opening of the access panel was lawful pursuant to the CPD policy governing the administrative inventory process. Indeed, in its findings of fact, the court averred that the access panel appeared to be "something that [could] be opened." (Apr. 23, 2021 Tr. at 12.) The court also credited Franklin's testimony that the access panel detached at the mere touch of his finger. The court echoed these factual findings in concluding that it was "legitimate" to open the access panel because it "looked like it could be an area you might store something." *Id.* at 23.

{¶ 55} However, the trial court concluded that Franklin's subsequent actions in reaching into the area behind the access panel were not authorized under the CPD policy. Specifically, noting that the photograph of the opened access panel revealed only electrical wiring, the trial court found it "obvious" that the access panel was not designed to store items, in contrast to other areas of a vehicle designed for that purpose, such as a glove box or console. *Id.* at 13-14. The court also found that Franklin's testimony about finally finding "a good hiding place" indicated that he did not think the access panel was designed for storage purposes. *Id.* at 14. The trial court thus concluded that Franklin did not reach inside the access panel for the purpose of inventorying the contents of "reasonably accessible areas" pursuant to the CPD policy; rather, Franklin utilized the inventory search as a pretext for conducting an evidentiary search for contraband.

{¶ 56} The trial court was also critical of the CPD policy itself. Although the court found that the policy "does not seem on its face all that unreasonable," it found the term "reasonably accessible areas" to be "a little bit vague" because it was not defined in the policy. *Id.* at 18. The court suggested that this lack of definitional specificity could be utilized by the police under different circumstances to support the search of gas tanks, engine compartments, or the substructure beneath carpeting under the guise that such areas are "reasonably accessible"—despite the fact that such areas are clearly not utilized for storage. The trial court also noted the absence of policy language specifically addressing the timetable for documenting items found during an inventory search. The court suggested that the failure to document items contemporaneously with discovery signals a pretextual evidentiary search rather than a legitimate inventory search.

{¶ 57} As noted above, the CPD policy requires officers to "[c]onduct an inventory of the contents of all reasonably accessible areas and containers in the vehicle, and complete an Impounded Vehicle Inventory."  (CPD Policy, Section III(A)(1)(d).)  During their testimony, Sanders parroted the "reasonably accessible areas" language in the policy; Franklin cited the policy as support for his decision to reach inside the access panel after it detached. Neither officer was asked to further define "reasonably accessible areas" or to explain how the police routinely interpreted that term.

{¶ 58} As to the inventory form, Sanders testified that he documented the items recovered from appellee's vehicle following his own personal observations and discussions with Franklin and Randall.  Franklin testified that he did not document the items immediately after discovering them; rather, he relayed his discoveries to Sanders from memory.  As noted above, Sanders completed the inventory form at 2:28 a.m. on September 4, 2020, approximately one hour after he initiated the traffic stop.  Neither officer was asked to address the timetable for completing the inventory form.

{¶ 59} After careful consideration, we find that the inventory search of appellee's lawfully impounded vehicle was objectively reasonable and performed in good faith in accordance with the CPD policy.  Initially, we acknowledge the trial court's concern that the CPD policy does not define either "reasonably accessible areas" or "containers."  However, an inventory search policy need not include every detail of search procedure.  " '[W]e do not think * * * *every detail* of search procedure must be governed by a standardized policy.' " *Williams*, 930 F.3d 44, 55 (2d Cir.2019), quoting *United States v. Lopez*, 547 F.3d 364, 371 (2d Cir.2008) (emphasis in *Williams*).  Indeed, the *Lopez* court averred, "[w]e doubt, for example, that the [United States Supreme] Court intended a requirement of standardized policy as to the order in which different parts of the car are searched, or whether officers performing the search need to report the results on a standardized form, or whether the search should be conducted by the officers responsible for the impoundment decision.  A standardized policy governing those questions would do nothing to safeguard the interests protected by the Fourth Amendment." *Id.*

{¶ 60} Further, inventory search policies may provide officers discretion in deciding which areas to search during an inventory.  *Wells*, 495 U.S. 1, 4 (1990) ("The allowance of the exercise of judgment based on concerns related to the purposes of an inventory search

does not violate the Fourth Amendment."). In this case, the CPD policy provides officers discretion to determine what constitutes "reasonably accessible areas" subject to an inventory search. Notably, courts have approved inventory-search policies authorizing search of vehicles and containers without any regard to accessibility at all. *Williams* at 54 (approving NYPD's inventory-search policy allowing officers to search "any area that may contain valuables"; *Wells* at 4 (policy of "opening all containers" is "unquestionably permissible"). Accordingly, we do not share the trial court's concern regarding the CPD policy's failure to define "reasonably accessible areas."

**{¶ 61}** Further, we disagree with the trial court's conclusion that the inventory search was unlawful because the area behind the access panel was not designed for storage. Initially, we note that by its own terms, the policy does not limit an inventory search only to "reasonably accessible areas" that are designed for storage. An area can be "reasonably accessible" even if not designed or typically utilized for storage. And the rationales behind the inventory-search exception support adopting policies to search areas that are not designed or typically utilized for storage but nonetheless may contain valuables, contraband and/or dangerous items. *See, e.g.*, *Williams* at 54-55 (removal of paneling to check inside the car's center console was consistent with the NYPD's standard procedures which required officers to search the vehicle's interior including any area that may contain valuables); *Torres*, 828 F.3d 1113, 1122 (upholding inventory search of air filter compartment in the engine cabin pursuant to police policy requiring officers to thoroughly search vehicles and containers; the air filter compartment was "obviously large enough to hold a firearm, and could be opened by lifting the hood and releasing the latches on the box").

**{¶ 62}** Here, just because it appears the space behind the access panel was not designed for storage does not mean it was not used for storage. In fact, the evidence indicates the area was used for storage. As Franklin testified, and as the footage from his body camera reveals, the bottom portion of the access panel was not in place and appears to have been opened and closed repeatedly. Indeed, Franklin testified that the cover looked like it had been "manipulated." (Apr. 7, 2021 Tr. at 58.) The latch that would normally hold the access panel in place was no longer functional, as evidenced by the easy detachment of the access panel upon the touch of Franklin's finger. Given these circumstances, Franklin

reasonably could conclude that the area behind the access panel was being used as a storage area.

{¶ 63} Also without merit is the trial court's concern that the drugs found during the search of the space behind the access panel were not in plain view. "[T]he scope of an inventory search is not restricted to items in plain view." *State v. Semenchuk*, 122 Ohio App.3d 30, 40 (8th Dist.1997), citing *Opperman*, 428 U.S. 364; *Hathman*, 65 Ohio St.3d 403. Further, the CPD policy does not limit an inventory search only to items that are in plain view; rather the policy requires the search of "reasonably accessible areas." In other words, the policy is concerned with accessibility, not visibility. Items can be reasonably accessible, even if not plainly visible.

{¶ 64} In addition, the trial court's concern that the CPD policy would permit searches of other areas of a vehicle—gas tanks, engine compartments and beneath carpeting—is unfounded. Pursuant to the policy, only "reasonably accessible areas" may be searched. The reasonableness requirement would prohibit searches of those parts of a vehicle that require special tools or cameras (such as the inside of the gas tank) or that can be accessed only by damaging or substantially altering the vehicle (such as pulling up the carpet). *See Williams*, 930 F.3d at 54 (officer "did not have to use any sort of 'special tool' to remove the paneling; nor did it take much force; nor was any damage done to the car, as the paneling could be 'snap[ped] right back into place' "). Further, courts have upheld searches of a vehicle's engine compartment under the inventory-search exception. *United States v. Lumpkin*, 159 F.3d 983, 987-88 (6th Cir.1998); *Torres*, 828 F.3d at 1121.

{¶ 65} We also find unavailing the trial court's concern that the CPD policy does not address whether officers must complete the inventory form contemporaneously with the search or may wait until the search is completed and rely on memory. As noted above, case law establishes that an inventory search policy need not include every detail of search procedure. Further, the evidence in this case establishes that Sanders completed the inventory form within one hour after consulting with Franklin and Randall and personally observing the contents of the vehicle. In addition, the fact that Franklin relayed his findings to Sanders from memory rather than documenting them himself was not unreasonable under the circumstances. The officers' body camera footage makes clear that Sanders was the officer in charge at the scene. Sanders tasked Franklin and Randall with conducting the

inventory search while he completed paperwork related to appellee's arrest.  Thus, it was entirely reasonable that Sanders would take charge of documenting the inventory after consulting with Franklin and Randall.

{¶ 66} Further, the trial court's reliance on *Gibson* is misplaced.  There, two officers conducted an inventory search pursuant to a police department policy that required officers to conduct an inventory search of the vehicle and containers found therein and report all personal property on a vehicle impound report.  The policy further directed that the inventory search be accomplished pursuant to standardized criteria which limited the discretion of police officers and ensured that the impound and inventory were legally performed and were not a guise for a general exploratory search.  One of the officers testified that when performing an inventory, he does not write anything down unless it is of "major value." *State v. Gibson*, 2:16-cr-00333-JAD-VCF, 2017 U.S. Dist. LEXIS 126956, at *12.  The other officer testified that he "typically" does not write down the items he sees during an inventory search; rather, he "keep[s] a memory of it." *Id.*  The district court found that the inventory search did not comply with the police department policy because the officers did not complete an inventory form, even though they found jewelry in the vehicle. *Id.*  The court stated, "Nobody ever 'made it to' the part of the form with 'the actual inventory of the property and the details of the vehicle and what's inside.' So the form was probably 'passed off to detectives or it was shredded and recycled.' " *Id.*  The court found that "[a] documented list or catalog of items is the hallmark of an inventory search. * * * The officers' testimony at the evidentiary hearing and the body camera images from their search show that this critical feature was missing from this search, suggesting that it was really just a general exploratory search conducted without the required warrant or another exception." *Id.* at *12-13.  Thus, the issue in *Gibson* was not that the officers failed to document the items found in the vehicle contemporaneously with the inventory search.  Rather, the issue was that the officers did not complete the inventory form at all.  In contrast, in the present case, Sanders documented the items recovered from the vehicle on the inventory form as required by the CPD policy.

{¶ 67} Further, the fact that the inventory form does not list every item in the vehicle does not render the inventory search unlawful under the Fourth Amendment.  As the body camera images reveal, the vehicle contained numerous items that had no meaningful value

and posed no safety threat. As noted above, the CPD policy requires that officers retrieve only specific items—contraband, weapons, $20 in currency bills, and other items of value. In specifically referencing only these items, the CPD policy contemplates that although a vehicle may contain items of little or no value, such items need not be listed on the inventory form. In *Lopez*, 547 F.3d 364, the court addressed a similar argument:

> Nor do we find merit in Lopez's argument that the failure to itemize each object found in the car, instead of covering items of lesser value under a general catch-all category of 'personal belongings,' is incompatible with the Supreme Court's warning that 'inventory searches should be designed to produce an inventory.' Wells, 495 U.S. at 4. The search did produce an inventory. The concept of an inventory does not demand the separate itemization of every single object. * * * That an officer might use a catch-all to cover objects of little or no value in no way casts doubt on the officer's claim that the purpose of the search was to make an inventory. It would serve no useful purpose to require separate itemization of each object found, regardless of its value, as a precondition to accepting a search as an inventory search. Such an obligation would furthermore interfere severely with the enforcement of the criminal laws by requiring irrational, unjustified suppression of evidence of crime where officers, conducting a bona fide search of an impounded vehicle, found evidence of serious crime but, in making their inventory, failed to distinguish between the maps of Connecticut and New York, or failed to list separately the soiled baby blanket or a pack of gum. Imposing a requirement to identify each item separately, regardless of lack of value, would furthermore add considerable administrative burden without in any way advancing the purposes of the Fourth Amendment to protect the public from 'unreasonable searches and seizures.'

*Id.* at 371-72 (internal citations omitted).

{¶ 68} Here, as in *Lopez,* the search of appellee's vehicle produced an inventory. The inventory form lists the drugs and ammunition found in appellee's car, as well as miscellaneous items such CD's, Christmas ornaments, miscellaneous tools, car stereo, cloths, jacket, trash, gloves and masks. We follow *Lopez* to conclude that Sanders' failure to separately itemize each CD, Christmas ornament, tool, cloth, piece of trash, or mask, regardless of lack of value, does not violate CPD's inventory policy and does not cast doubt on the officers' statements that the purpose of the search was to make an inventory. Indeed,

imposition of a requirement to identify each of these items would have added considerable administrative burden without advancing the purposes of the Fourth Amendment.

{¶ 69} Further, we cannot agree with the trial court's conclusion that once Franklin saw that the area behind the access panel was not a designed storage area and there were no items in plain view, his reaching into that reasonably accessible space constituted a pretextual evidentiary search.

{¶ 70} The trial court's conclusion that Franklin utilized the inventory search as a pretext for an evidentiary search appears to be based, at least in part, on the trial court's characterization of the officers' actions (prior to Franklin's discovery of the access panel) as "rummaging" through the vehicle. (Apr. 23, 2021 Tr. at 22.) The trial court correctly noted that the law prohibits utilization of an inventory search as a ruse for rummaging through a vehicle in order to discover incriminating evidence. Although the court acknowledged Franklin's testimony that he examined documents to make certain he was not leaving behind documentation appellee might need, the court nonetheless concluded that his actions "look[ed] like rummaging to me." *Id.* Appellee picks up this thread in his brief, arguing that the officers were "rummaging through documents and items in Mr. Johnson's vehicle without any sense of purpose." (Appellee' Brief at 20.)

{¶ 71} We disagree with the characterization of the officers' actions as "rummaging." Sanders testified that the CPD policy requires officers to conduct inventory searches, including the completion of inventory forms, for the purpose of protecting the city from claims of property theft or destruction. The CPD policy necessitated careful examination of items in the vehicle in order to determine whether those items contained personal property to be included on the inventory form. Here, because the vehicle contained loose cash, the officers' perusal of the items in the vehicle to determine whether additional cash might be found is consistent with the CPD policy requiring an inventory search to protect the city from claims of property theft. Indeed, Franklin testified that he examined the operator's manual and other documents while "looking for money" (Apr. 7, 2021 Tr. at 77), and because he "didn't want to be responsible for missing cash or anything like that." *Id.* at 54-55. "Cash, credit cards, negotiable instruments, and any number of items could be hiding between the pages of a notebook, and could give rise to a claim against the city if lost." *United States v. Andrews*, 22 F.3d 1328, 1335 (5th Cir.1994).

{¶ 72} The trial court's pretext conclusion was also based on Franklin's subjective motivations in conducting the inventory search. Under the Fourth Amendment, reasonableness is an objective inquiry; subjective motives generally play no role in the reasonableness analysis. "An action is 'reasonable' under the Fourth Amendment, regardless of the individual officer's state of mind, 'as long as the circumstances, viewed *objectively*, justify [the] action.' " *Brigham City v. Stuart*, 547 U.S. 398, 404 (2006), quoting *Scott v. United States*, 436 U.S. 128, 138 (1978) (emphasis in *Stuart*). "The officer's subjective motivation is irrelevant." *Stuart* at 404, citing *Bond v. United States*, 529 U.S. 334, 338 (2000), fn. 2.

{¶ 73} In determining whether the inventory search was a pretext for an evidentiary search, the court stated "I think you can look at the actions and statements of the officers. And I do think in their minds, [w]ell, this is an inventory search. But I think also the evidence would allow you to infer that they suspect drugs are there and they are kind of looking for drugs." *(*Apr. 23, 2021 Tr. at 20.) As an example, the court noted Franklin's skepticism that the cash found on appellee's person and vehicle derived from his painting business. The court inferred from this comment that Franklin was hoping to find contraband while inventorying the vehicle. The court also noted Franklin's comments that when performing inventory searches, he always looks for areas where criminals could hide contraband, and that he found such a hiding place while inventorying appellee's vehicle. The court inferred that Franklin knew that the access panel was not designed as a storage area; rather, he was looking for, and ultimately found, a good hiding place for contraband.

{¶ 74} The statements made by the trial court clearly indicate that it considered the individual officers' (particularly Franklin's) subjective motivations in analyzing whether the inventory search was reasonable under the Fourth Amendment. As set forth in the foregoing caselaw, the officers' subjective motivations are irrelevant in a reasonableness analysis.

{¶ 75} Further, an inventory search is not pretextual simply because an officer expects or hopes to find contraband. "[T]he fact that an officer suspects that contraband may be found does not defeat an otherwise proper inventory search." *Lumpkin*, 159 F.3d 983, 987 (6th Cir.1998). As noted in *Lopez*, 547 F.3d 364:

> [T]he Supreme Court has not required an absence of expectation of finding criminal evidence as a prerequisite to a

> lawful inventory search. When officers, following standardized inventory procedures, seize, impound, and search a car in circumstances that suggest a probability of discovering criminal evidence, the officers will inevitably be motivated in part by criminal investigative objectives. Such motivation, however, cannot reasonably disqualify an inventory search that is performed under standardized procedures for legitimate custodial purposes. Under the Supreme Court's precedents, if a search of an impounded car for inventory purposes is conducted under standardized procedures, that search falls under the inventory exception to the warrant requirement of the Fourth Amendment, notwithstanding a police expectation that the search will reveal criminal evidence. If good faith is a prerequisite of an inventory search, the expectation and motivation to find criminal evidence do not constitute bad faith.

*Id.* at 372 (internal citations omitted).

{¶ 76} Here, it is undisputed that pursuant to CPD's policy, appellee's vehicle was lawfully impounded following his arrest for driving under suspension and was thus subject to an inventory search of all "reasonably accessible areas." While the officers could also have had an investigative motivation to search appellee's vehicle, such motivation did not disqualify the legitimate inventory search performed under the CPD's reasonable standardized policy.

{¶ 77} Moreover, the trial court's own findings confirm that any investigatory motive of the officers was in addition to their legitimate motive to conduct a lawful inventory search of appellee's vehicle. The court made several statements in this regard— "the police are conducting an inventory search, but they are also hoping that they find some contraband"; "this is an inventory search. But I think also the evidence would allow you to infer that they suspect drugs are there and they are kind of looking for drugs"; "yes, they were doing an inventory search, but they were also kind of using it as an excuse to look for drugs as a pretext." (Apr. 23, 2021 Tr. at 10, 20, and 22, respectively.)

{¶ 78} Thus, the trial court's own findings establish, at most, a dual motive. However, the existence of a dual motive is legally insufficient to invalidate an inventory search that is performed under standardized procedures for legitimate custodial purposes. *Bertine*, 479 U.S. at 372 (inventory search is invalid only if the officers acted in bad faith or for the sole purpose of investigation). The trial court having found that the officers were

motivated to conduct a lawful inventory search, it was legally immaterial that they were also motivated to search for contraband.

{¶ 79} Finally, we address the trial court's suggestion that the search was pretextual because the inventory form did not list the cash found in appellee's vehicle. As noted earlier, the officers' body camera footage reveals that the vehicle contained a relatively small amount of cash. (Def's Ex. 4.) Further, the CPD's criminal investigative summary (Def.'s Ex. 1) lists the total cash found on appellee's person and inside his vehicle ($3,156.38) and states that the cash was seized as evidence and subject to forfeiture. Thus, the listing of the cash on the criminal investigative summary rather than the inventory form is not proof of bad faith or pretext, especially where, as here, only a small percentage of the seized cash was recovered from the vehicle. *See United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir.1987) (failure to complete the inventory form does not mean that the search was not an inventory search).

{¶ 80} For the foregoing reasons, we conclude that the search of the area behind the access panel in appellee's vehicle, conducted pursuant to the standardized policies of the CPD, was lawful under the inventory-search exception to the Fourth Amendment.[6] We further find that the search of the area behind the instrument panel was lawful pursuant to the automobile exception to the Fourth Amendment warrant requirement. " 'Under the automobile exception to the warrant requirement, the police may search a motor vehicle without a warrant if they have probable cause to believe that the vehicle contains contraband.' " *State v. Bazrawi*, 10th Dist. No. 12AP-1043, 2013-Ohio-3015, ¶ 18, quoting *State v. Battle*, 10th Dist. No. 10AP-1132, 2011-Ohio-6661, ¶ 33. In the context of an automobile search, probable cause is " 'a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile or other vehicle contains that which by law is subject to seizure and destruction.' " *State v. Parrish*, 10th Dist. No. 01AP-832, 2002-Ohio-3275, ¶ 27, quoting *State v. Kessler*, 53 Ohio St.2d 204, 208 (1978), citing *Carroll v. United States*, 267 U.S. 132 (1925). "This probable cause standard requires specific, objective facts which would justify the issuance of a search warrant by a judge or magistrate." *Parrish* at ¶ 27. Thus, "[t]he determination of probable cause is fact-

---

[6] Having so found, we need not address the state's arguments that the search of the area behind the access panel was lawful under the good-faith exception to the Fourth Amendment warrant requirement.

dependent and turns on what the officer knew at the time he made the stop and/or search."
*Battle* at ¶ 34.

{¶ 81} Discovery of the bags of heroin in the space behind the access panel pursuant to the lawful inventory search of the vehicle provided the officers with probable cause to believe that the vehicle contained additional contraband. Accordingly, the subsequent search of the area behind the instrument panel was lawful under the automobile exception to the Fourth Amendment warrant requirement.

{¶ 82} Because the trial court erred by concluding that the search of the automobile was unlawful, we sustain the state's sole assignment of error, reverse the trial court's judgment granting appellee's motion to suppress, and remand the matter to the trial court for further proceedings in accordance with law and consistent with this decision.

*Judgment reversed; cause remanded.*

NELSON, J., concurs.
JAMISON, J., dissents.

NELSON, J., retired, of the Tenth Appellate District, assigned
to active duty under authority of Ohio Constitution, Article IV,
Section 6(C).

JAMISON, J., dissenting.

{¶ 83} Because I would affirm the trial court's ruling and the majority does not, I respectfully dissent.

{¶ 84} The facts in this case are uncontroverted and can partially be seen in the video from the officer's body camera. Simplistically, defendant was being taken into custody and his car was being impounded. Columbus Police Department ("CPD") policy sets forth specific procedure to be followed when a vehicle is impounded. Officers must "[c]onduct an inventory of the contents of all reasonably accessible areas and containers in the vehicle, and complete an Impounded Vehicle Inventory, form A-32.107." (CPD policy, Section III(A)(1)(d).) Franklin first testified that he checked the front passenger area, including the door, the floor, the glove compartment and "containers in the vehicle that are accessible." (Apr. 7, 2021 Tr. at 54; State's Ex. E.) After Randall told Franklin he discovered a "ton more cash" on the driver's side of the vehicle, Franklin began searching the center console. *Id.* at 62; State's Ex. E. He further testified that he touched the access panel with his finger "[f]or

the purpose of trying to open it": however, he did not "grab" or "manipulate" it. *Id.* at 80, 55. When he touched the panel it "fell off." *Id.* at 55. Franklin is careful that his actions with the manipulation of the center console cannot be seen by his body camera. Franklin speculates that it fell off because it is "[worn] down" from "multiple" usage. *Id.* He acknowledges that the body camera does not show precisely how he touched the access panel or how readily it detached. Officer Franklin assumed that the panel was for maintenance purposes. Despite this assumption, the officer begins to look at the panel more closely for access.

{¶ 85} Because both officers were careful to avoid their body camera's range of vision when searching, upon review of the video it is impossible to see how he touched the panel or if he manipulated the panel. It is odd that neither officers' body camera caught the opening of the panel in either of their camera's range of vision. There is a slight clicking sound before the panel door is seen laying in the floorboard. However, once the panel came off there was no contraband or anything of value that the officer could see. It is not an area designed for storage like the console or glove box. The officers simply were there to search and search they did. His excited reference to the good hiding place indicates that he did not consider the access panel for maintenance purpose, but he was searching it to see what he could discover. The officers' actions were investigative and exceeded the purpose of an inventory search once he stated that he opened it because it seemed worn down from multiple usage.

{¶ 86} Even more striking is the fact that as they found money, they did not count it for the inventory. The officers talked among themselves where money was found, but at no time did they count the money and record it on the inventory. Cash is something of value designed to be inventoried specifically, yet not much thought or care was taken to be sure that the amount was correct.

{¶ 87} A CPD policy should not exceed the intent of Fourth Amendment protections against warrantless searches. Much attention is given to ferreting out crime, but the officers have an obligation to follow the law to ferret out crime. It is an obligation to uphold the U.S. Constitution, the Constitution of the State of Ohio, and the laws of the City of Columbus. Police searches require warrants unless one of the exceptions to the warrant requirement applies (e.g., consent, exigent circumstances, plain view). The search that occurred in this

case did not fall into a known exception and it is unreasonable to believe that a maintenance panel, not designed to be a compartment for storage, would be part of an inventory search in this case.

{¶ 88} Police would violate the Equal Protection Clause if they investigated a suspect on suspicion of drug trafficking because he had an empty cellophane bag and cash when there was no odor of alcohol or marijuana. He had indicia of a business and told the officers he was a painter. CPD found his business cards while rummaging through his vehicle. The officers mocked him and began to search more in earnest. Also troubling, is the lengths to which the term "reasonably accessible" is stretched. Would the reasonably objective person in this position begin to search a panel that is for maintenance purposes in an inventory search? I answer in the negative.

{¶ 89} I would affirm the trial court's finding that the search exceeded the scope of an inventory search. Therefore, I respectfully dissent.

––––––––––––––––––